No. 45,242

CITY OF ABILENE, *Appellee,* v. ISAAC C. HALL, *Appellant.*

(451 P. 2d 188)

Opinion filed March 8, 1969.

*John F. Christner,* of Abilene, argued the cause and was on the brief for the appellant.

*D. V. Romine,* of Abilene, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action in which the defendant was found guilty in the police court of the city of Abilene, Kansas, of driving an automobile while under the influence of intoxicating liquor on the streets in Abilene, in violation of ordinance on the 8th day of March, 1967, and upon appeal to the district court was found guilty of such offense by a jury. Appeal has been duly perfected.

The questions pertain to the admissibility of evidence at the trial in the district court.

Only the facts necessary to determine this appeal will be stated. Robert Harvey, a chemist employed by the Kansas State Department of Health, was called as a witness. He holds a Bachelor of Science Degree in chemistry from Washburn University at Topeka, Kansas, and had performed blood alcohol examinations for the State Department of Health for approximately two and one-half years prior to the time of his testimony. He received his training from Dr. Glendening, who is head of the chemistry section of laboratory services at the Kansas State Department of Health. Approximately 85 percent of Robert Harvey's time was spent with the State Department of Health in making blood alcohol analyses.

Harvey performed the blood alcohol test on the sample of blood taken from the defendant relative to the offense charged herein, and upon the evidence there is no question but that the specimen of blood analyzed was traced to the defendant as the specimen taken from him at the time of his arrest.

The method used in making the blood alcohol test was that of "Gas Chromatography" using an instrument known as a "Beckman GC-4 Gas Chromatograph."

Upon direct examination Harvey testified he determined the percent by weight of ethyl alcohol in the sample of blood taken from the defendant and determined the percentage to be 0.288. He further testified he was fully familiar with the machine he was using and with its operation. He testified this method of determining the alcoholic content in blood is accurate and scientifically accepted.

The questions presented are confined to the method used in determining the blood alcohol content, the Beckman GC-4 Gas Chromatograph being a new device used to determine blood alcohol content. The appellant contends the trial court erred in accepting the testimony of Harvey regarding blood alcohol test procedures and results because Harvey was not acquainted with the testing device. He further contends the court erred in not requiring a sufficient foundation prior to the acceptance in evidence of an exhibit disclosing the blood alcohol test results.

Harvey testified the gas chromatograph instrument, used in determining blood alcohol content, is much more complicated and sophisticated than any of the other methods previously used in determining blood alcohol content. Highly summarized from his testimony on both direct and cross examination we glean a description as follows:

The Beckman GC-4 Gas Chromatograph is an instrument used for detecting various organic vapors. The process begins by placing one cubic centimeter of whole blood in a 35 cubic centimeter serum bottle and sealing it, allowing the sample to come into equilibrium with vapors forming above the liquid. One cubic centimeter of the vapor is then withdrawn and injected into the machine. From this point on the process becomes completely mechanical save the interpretation of the graphic results. After injection the vapor passes through one of two vertical six-foot stainless steel columns which have an inside diameter of one-fourth inch. The other column is identical and is used solely for control purposes. The columns are packed with a white, ground firebrick material known as chromosorb, and helium gas under pressure is utilized as a vehicle. The columns are enclosed in an oven which is maintained at a constant temperature of 100° centigrade.

At the terminus outside of each column is a flame, itself enclosed in the instrument and whose burning is controlled by an independent supply of hydrogen and oxygen. Before a sample is injected for analysis these flames are completely balanced. When the sample reaches the one flame the balance is upset and a change is caused in the intensity of burning which is noted by means of an electronic detector and recorder. The recorder is set to plot a straight line prior to injection of the sample. It is the change in this line or peaks on the graph which determine the quantity of the substance present. Likewise, it is the time it takes for the substance to pass through the column which determines the character of the substance. The

time the substance is retained in the column varies with its molecular weight and structure, and the retention time is measured on the same graph and is determined by the graph or chart moving through the pen of the detector at the rate of one-half inch per minute. It is the difference in burning of the flames and the retention time in the column that determines the character of the substance and its quantity.

Harvey testified the retention time of ethyl alcohol is three minutes.

On cross examination Harvey testified that on the particular day he ran the test on the sample of blood taken from the appellant he made a test run on known concentrations of blood and alcohol samples by running them through the machine prior to making the test on this particular sample. Accuracy of the instrument is checked by running the standard samples through. This was normal daily procedure.

When Harvey was asked on cross examination how he determined the alcoholic content when the gas passed through the column and reached the flame, he said:

"A. Well, there's a detector, and don't ask me how it works, because I really couldn't tell you, but there's a detector at the end of both of these flames which can detect the flame height and burning characteristics of the flame. When the sample hits the hydrogen flame it's going to cause a change in the characteristics of the burning. The detector senses this and it's sent to a—uh, the recorder, which amplifies—

"Q. Now, just a minute before we go further. The sample has now reached the flame, and the detector device has come into play.

"A. Yes, sir.

"Q. Then from that time forward—I believe you indicated in the rest of your answer that this is mechanical?

"A. Sir?

"Q. That it was mechanical what the detector did and whatever else happened; is that right? The device activates itself and goes through certain procedures or makes certain marks on something?

"A. I inject the sample, and from that time on until it is plotted on the chart paper, I—it's all done within the instrument.

"Q. I see. And you can't explain *this detector* to us?

"A. *That's a very sophisticated electronic piece of equipment. I wouldn't even begin to be able to explain it.*

"Q. And is this considered a new device in the field for making these analyses?

"A. Yes—gastromatography. It's real new. A detector is attached to the standard column as well as the column used for analysis. A chemist can tell

if the detector attached to the analysis is functioning properly by running standard solutions and plotting the standard results." (Emphasis added.)

By the provisions of K. S. A. 8-1005, applicable herein, the legislature has authorized the admission of evidence of the amount of alcohol in the defendant's blood at the time alleged in a prosecution for driving while under the influence of intoxicating liquor. The statute reads in part:

"Any criminal prosecution for the violation of the laws of this state relating to driving of a motor vehicle while under the influence of intoxicating liquor, . . . or in any prosecution for a violation of city ordinance relating to the driving of a motor vehicle while under the influence of intoxicating liquor, evidence of the amount of alcohol in the defendant's blood at the time alleged, as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance may be admitted, and shall give rise to the following presumptions:

"(a) If there was at that time less than 0.15 percent by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

"(b) If there was at that time 0.15 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor."

Courts are in accord that to be permitted to evaluate the findings or results of any chemical tests for alcoholic content of blood the witness must be an expert on that subject, having the proper academic background and practical experience. The cases seem to indicate that a properly educated and practicing medical doctor, chemist, medical technologist, biologist, biochemist or toxicologist has the necessary qualifications. (77 A. L. R. 2d 971, 973; and see, *State v. Foster*, 198 Kan. 52, 422 P. 2d 964, including cases cited therein; and *State v. Bailey*, 184 Kan. 704, 339 P. 2d 45.)

In one of the earlier cases of this type involving a breath test by means of a drunkometer, the Supreme Court of Michigan extended the state's burden in presenting chemical test evidence. While it did not hold this type of evidence inadmissible, it ruled that the state must show the particular test method employed had received general acceptance by the medical profession, or that it had been given scientific recognition as being capable of accurately establishing the alcoholic content of the subject person's blood. Because the prosecution had failed to show this as a condition precedent to the admissibility of such evidence, to the satisfaction of the Supreme Court of Michigan, the conviction was reversed. (*People v. Morse,* 325 Mich. 270, 38 N. W. 2d 322 [1949].)

The Michigan rule, however, has not generally been followed. Appellate courts in other jurisdictions have generally held that the fact there may be some disagreement on the part of a few in the scientific and medical community as to the reliability of a particular test method is a matter affecting the weight of such evidence and not its admissibility. They have held such evidence admissible as long as a qualified expert witness testifies that the particular test method employed in a given case is reliable and accurate in his opinion, and also that it is generally accepted as such by other experts in the field. (*McKay v. State*, 155 Tex. Cr. R. 416, 235 S. W. 2d 173 [1951]; *People v. Bobczyk*, 343 Ill. App. 504, 99 N. E. 2d 567 [1951]; *Commonwealth v. Mummert*, 183 Pa. Super. 638, 133 A. 2d 301 [1957]; *People v. Garnier*, 20 Ill. App. 2d 492, 156 N. E. 2d 613 [1959]; *Toms v. State*, 95 Okla. Cr. 60, 239 P. 2d 812 [1952]; and see, *State v. Wardlaw*, 107 So. 2d 179 [Fla. App. 1958].) These cases seem more persuasive to us and we adhere to the rule they announce.

A comprehensive study of decisions dealing with the proper presentation of chemical tests for intoxication is found in Donigan on Chemical Tests and the Law, pp. 62-71.

In *People v. Bobczyk*, supra, the court had before it a breath test by means of a drunkometer, and in affirming a conviction for driving while under the influence of intoxicating liquor, refused to follow the Michigan rule, stating:

"Defendant argues that there is a lack of unanimity in the medical profession as to whether intoxication can be determined by breath. Even so we think this objection goes to the weight of the testimony and does not destroy its admissibility. The evidence in this case shows that the experts called by the State are eminently qualified in the field in question. . . ." (pp. 510, 511.)

The Uniform Vehicle Code, adopted by the National Committee on Uniform Traffic Laws and Ordinances, specifically provides that:

"Chemical analyses of the person's blood, urine, breath, or other bodily substance to be considered valid under the provisions of this section shall have been performed according to methods approved by the State Department of Health and by an individual possessing a valid permit issued by the State Department of Health for this purpose. The State Department of Health is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the State Department of Health." (UVCA § 11-902 [c] [1962].)

Although the Uniform Vehicle Code has not been adopted by Kansas, it is to be noted Harvey testified he was employed by the State Department of Health; that he received his training under Dr. Glendening; and that he was supervised in his work by Dr. Glendening. Harvey also testified the method used herein to determine the alcoholic content of the appellant's blood was adopted by the State Department of Health only after the method had been researched for months. It may be said, therefore, the method used to determine the alcoholic content of the appellant's blood was approved by the State Department of Health, and that Harvey, who made the test, had the necessary qualifications as an expert, authorized by the State Department of Health, to make an analysis of the alcoholic content of the appellant's blood by the gas chromatograph method. He had sufficient education, training and experience, and had a complete and full understanding of the device which he was using to make the test.

This court in *City of Wichita v. Showalter,* 185 Kan. 181, 341 P. 2d 1001, held the testimony of the officer administering a test on the alcometer was properly received in evidence even though the prosecution failed to show that the operator of the machine fully understood all the workings of such machine.

A paper entitled "Determination of Alcohol and Other Volatiles in Blood by Gas Chromatography" was presented at the Laboratory Section of the American Public Health Association at its 96th annual meeting in Detroit, Michigan, November 14, 1968, prepared by Blaine L. Glendening, Ph. D., and Nicholas D. Duffett, Ph. D., F. A. P. H. A., they being the Chief, Chemistry Section and Director, of the Laboratory Services of the Kansas State Department of Health. It states:

"Comparison determinations on the gas chromatograph of a number of samples were made with two other standard methods, the autoclave diffusion method of Kingsley and Current and the distillation method of Heise. . . ." (p. 7.)

The report discloses the percentages shown on all three methods were substantially identical. The following is stated in the summary:

"The method described using the gas chromatograph for the determination of blood alcohol on a routine basis is simple, convenient, specific and reliable." (p. 11.)

We hasten to add the above paper prepared by Dr. Glendening and Dr. Duffett, reported as above indicated, was not before the trial court as evidence in this case, nor was either Dr. Glendening or Dr. Duffett called as a witness in the case.

While evidence of this character may have strengthened the prosecution's case, we do not think its absence fatal for the reasons heretofore stated.

We do not think the failure of the witness Harvey to understand the intricate functioning of the sophisticated electronic detector and recording device employed by the Beckman GC-4 Gas Chromatograph, used to determine the alcoholic content of the appellant's blood, is vitally material to the admission of Harvey's testimony in evidence, or a prerequisite to the admission of the test results in evidence. Of vital importance, we think, is the fact that Harvey testified, before making the particular test in the instant case on the sample of blood taken from the appellant, that tests were run on known concentrations of blood and alcohol samples by using the gas chromatography instrument to check the accuracy of its operation, and that before running any tests this was normal daily operating procedure.

Of course, the expert who performs a blood alcohol analysis may be cross-examined in detail as to whether the proper procedures were followed; the equipment was in proper working order; the exact quantities of the proper substances were measured out; the exact temperatures were employed; and the operator, after a course of instruction, was qualified to make the test. On many of these matters cross examination was waived.

As a qualified expert Harvey testified the gas chromatograph method employed herein was reliable and accurate in his opinion, and also generally accepted as such by other experts in the field.

Accordingly, we hold the objections made by the appellant herein to the admission of the testimony of the witness Harvey, and to the results of the test determining the alcoholic content of the appellant's blood ascertained by using such instrument, go to the weight of the evidence rather than to its admissibility, and the trial court did not err in admitting such evidence at the trial.

The judgment of the lower court is affirmed.