No. 88,881

STATE OF KANSAS, *Appellant*, v. WAYNE GRAHAM, *Appellee*.

61 P.3d 662

Opinion filed January 24, 2003.

*Charles A. Peckham,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellant.

*Douglas F. Martin,* of Bosch & Martin, LLC, of Clay Center, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: Wayne A. Graham was found guilty by a magistrate judge of driving under the influence of alcohol. Graham appealed his conviction to the district court, then filed motions in limine, a motion to suppress, and a motion for a *Frye* hearing concerning the admissibility of the blood alcohol test evidence. Rawlins County District Court Judge Glenn D. Schiffner ruled that the enzyme analysis testing procedure used by the State did not meet the requirements of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), and that the blood test results were inadmissible at trial. The State now brings an interlocutory appeal.

On May 5, 2001, Greg Jirak, a Second Lieutenant for the Kansas Highway Patrol, observed a flatbed semi-trailer truck driving erratically through a 55 m.p.h. construction zone east of Atwood, Kansas, on Highway 36 at a speed of 75 m.p.h. Jirak activated his lights and the truck pulled over. Jirak testified that in the process of issuing a written warning for speeding to Graham, he noticed an odor of alcohol on Graham's breath. Jirak had Graham complete a preliminary breath test. The red light produced by the Intoximeter indicated that Graham's blood alcohol concentration was above .08. Jirak placed Graham under arrest for driving under the influence of alcohol in violation of K.S.A. 8-1567.

Jirak and Graham agreed that Jirak would drive Graham's truck to a mixing strip nearby rather than having it towed. While he was in the cab of the truck driving it to the mixing strip, Jirak saw an open can of beer in plain view between the driver and passenger seat just inside the sleeper compartment. Jirak transported Graham to the sheriff's office in Atwood and read the implied consent forms to him. Graham agreed to a blood test, so Jirak took him to the Rawlins County Hospital where a blood sample was drawn.

Graham filed a motion to suppress (1) evidence of the alcoholic beverage container found in the vehicle; (2) any statements he

made after he was stopped; (3) any statements he made prior to being given the *Miranda* warnings; and (4) all medical records and reports from the Rawlins County Hospital pursuant to privilege. District Magistrate Judge Charles P. Carroll granted the request to suppress evidence of the alcoholic beverage container but denied the remainder of the motion. Judge Carroll found Graham guilty of driving under the influence of alcohol in violation of K.S.A. 8-1567.

Graham appealed his conviction to the district court and requested a jury trial. Judge Schiffner conducted a hearing on whether the blood alcohol testing procedure employed by the State met the *Frye* standard.

David Johnson, the laboratory manager at the Rawlins County Health Center, testified at the hearing on behalf of the State. Johnson's background and experience include a bachelor's degree in science and biology, a 2-year degree in medical technology, over 10 years' employment as a medical technologist, and a certificate from the American Society of Clinical Pathologists.

Johnson stated that the laboratory began using the Kodak Vitros 250 machine in January 2001, which employs an "enzyme analysis" method of testing plasma for blood alcohol concentration. Johnson explained that the machine employs an enzyme chemical reaction to test for the presence of ethanol in blood. He testified that proficiency tests performed using control samples for blood alcohol indicated that the machine was functioning properly during 2001. Johnson testified that this type of machine was commonly used in other hospitals and labs and agreed that the test results produced by the machine were generally accepted both by the hospital laboratory community and by physicians in treating patients.

Johnson told the court that there were three methods for testing blood alcohol concentration, including gas chromatography, dichromate methodology, and enzyme analysis. During cross-examination, he conceded that the gas chromatography method, which tests the blood alcohol concentration based on molecular weight, was "considered the gold standard in the field." Johnson stated that the lab procedures in place recommended that the enzyme analysis test results be confirmed by gas chromatography, but ad-

mitted the results in this case were not confirmed. In addition, he testified that the standard deviation of the enzyme analysis from the gold standard was 11 milligrams per deciliter, or in the range of a 5½% to 7% positive bias. Johnson conceded that it was possible that the positive bias could result in a reading of .081 blood alcohol concentration when, in fact, it should read .079. Johnson testified, however, that based on his discussions with personnel at the state health and environment laboratory and the Kansas Bureau of Investigation (KBI), he believed the enzyme analysis test for measuring blood alcohol concentration was generally accepted throughout the state of Kansas by courts and forensic scientists.

J. Robert Zettl, a private forensic toxicologist from Centennial, Colorado, appeared on behalf of Graham. His qualifications consist of a bachelor of science degree in bacteriology with a minor in physical chemistry, and a master's degree in public administration. Zettl is a Diplomat of the American Board of Forensic Examiners, and a Fellow of the American Academy of Forensic Science. Zettl's past employment included work at the Colorado State Health Department in the area of breath, blood, and urine drug and alcohol testing.

Zettl did not agree that the enzyme analysis test was "generally accepted in courts of law for the purposes of ascertaining blood alcohol content" in criminal cases. Moreover, he testified it was his personal opinion that the enzyme analysis method for testing blood alcohol content should not be accepted for the purposes of admission in criminal cases in Kansas. According to Zettl, the standard deviation and percent of error rate for the enzyme analysis method of testing was "probably closer to 10 percent" and was not reliable. Zettl also stated that the error rate reported by the manufacturer of the Intoxilyzer breath test instrument was plus or minus 5 percent and that many states allowed a plus or minus 10 percent error rate. He stated that he thought the error rate allowed in Kansas with the Intoxilyzer was "plus or minus .01," but that "it may be plus or minus 10 percent." In addition, he also conceded that the gas chromatography method had an error rate of approximately 5 percent. Zettl did not refer to any specific scientific studies or any

tests he had conducted demonstrating inaccuracies in the enzyme reaction method.

Judge Schiffner ruled as a matter of law that the enzyme analysis test to determine blood alcohol concentration did not meet the requirements of *Frye,* and that the blood test results were inadmissible at trial. The State filed an interlocutory appeal, pursuant to K.S.A. 22-3603, of the suppression of the results of the blood tests and the district court's determination that the enzyme analysis method was not an appropriate method of introducing blood alcohol evidence in a criminal court. The interlocutory appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

The State contends on appeal that the district court incorrectly ruled as a matter of law that the enzyme analysis test to determine blood alcohol concentration did not meet the requirements of *Frye,* and erred in holding that the blood test results were inadmissible at trial. The State requests that this court overrule the district court and allow the admission of the blood alcohol evidence.

When an appellate court considers the trial court's application of the *Frye* standard, which is a question of law, the appropriate standard of review is de novo. *Kuhn v. Sandoz Pharmaceuticals Corp.,* 270 Kan. 443, 455-56, 14 P.3d 1170 (2000).

"Although an abuse of discretion standard of review generally governs the admissibility of evidence, including expert testimony [citations omitted], we review a trial court's *Frye* ruling de novo because the outcome of a *Frye* holding transcends individual cases such that applying less than a de novo standard could lead to inconsistent treatment of similarly situated claims. [Citations omitted.]" *State v. Shively,* 268 Kan. 573, 576, 999 P.2d 952 (2000).

Graham presents numerous arguments designed to dissuade this court from overruling the district court's decision. Graham contends that no Kansas appellate court has ever taken judicial notice of a scientific test under *Frye* where the trial court excluded the evidence and cautions against this court taking judicial notice of the enzyme method of testing. Graham submits that if this court were to take judicial notice of this method of testing, it would violate his due process and equal protection rights. Graham states that Kansas has never adopted the enzyme method as an appro-

priate test for blood alcohol concentration in DUI cases. Graham cites learned treatises advocating against the use of enzyme analysis for judicial purposes. According to Graham, the testimony of Zettl, his expert witness, was particularly strong in advocating against the use of enzyme analysis in court. Graham urges this court to find that the district court did not abuse its discretion when it held the enzyme analysis blood test evidence was inadmissible.

The State contends that blood alcohol evidence produced through enzyme analysis is admissible in Kansas for several reasons. First, the State argues that Kansas courts have previously admitted such blood alcohol test results; the implication of this argument is that the district court need not have applied the *Frye* test because the method was neither new or experimental. The State further notes that the enzyme method is accepted in a number of States and asserts that the enzyme analysis method of determining blood alcohol concentration satisfies the *Frye* test. The State argues that the testimony of its expert witness Johnson supports the *Frye* requirements of general acceptance and reliability of the enzyme analysis method. According to the State, the accuracy of the enzyme method is further demonstrated in the testimony of both expert witnesses, who agreed the enzyme method is generally used and accepted for medical purposes in Kansas. Finally, the State argues against applying a different standard for forensic versus clinical tests under *Frye* because of the necessity for accuracy in both. According to the State, since both expert witnesses agreed that the enzyme method is generally used for clinical (hospital) purposes in Kansas, and since the majority rule in state courts is that drug or blood alcohol tests performed for clinical purposes are routinely admissible under the business records exception, this method of testing should be admitted under *Frye*.

Graham's argument that this court should hesitate to take judicial notice of a scientific test under *Frye* where the district court has excluded the evidence is baseless. First, K.S.A. 60-412(c) provides that an appellate court may take judicial notice of any matter specified in K.S.A. 60-409, even if the court below did not. *State v. Wolfe*, 194 Kan. 697, 698, 401 P.2d 917 (1965). K.S.A. 60-409(a) allows a court to take judicial notice of "the common law, consti-

tutions and public statutes in force . . ., and of such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute." The purpose of allowing judicial notice is to save time by eliminating the necessity of formal proof of undisputed facts. *Van Welden v. Ramsay's Inc.*, 199 Kan. 417, 423, 430 P.2d 298 (1967). Where a new test technique and its underlying scientific principles have gained sufficient acceptance in the scientific community, we note that other courts have taken judicial notice of it. *People v. Smith,* 215 Cal. App. 3d 19, 25, 263 Cal. Rptr. 678 (1989), *reh. denied, rev. denied* (1990).

Second, as noted above, an appellate court's review of the trial court's application of the *Frye* test is de novo. "The definition of a de novo hearing is a decision of the matter anew, giving no deference to findings and conclusions previously made." *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, Syl. ¶ 4, 39 P.3d 21 (2002). Thus, an appellate court has the power and authority to exercise its judgment afresh, reaching a conclusion independent from the court below. *Cf. In re Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, Syl. ¶ 1, 14 P.3d 1099 (2000).

In 1923, the *Frye* court considered whether the trial court erred when it refused to allow a scientist to testify concerning the results he obtained from administering a systolic blood pressure deception test to the defendant. The deception test involved a procedure based on the theory that the utterance of a falsehood would be reflected by an increase in the subject's systolic blood pressure. The *Frye* court affirmed the trial court, stating:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

"We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." 293 F. at 1014.

Thus, the *Frye* standard of general acceptance "applies where a new or experimental scientific technique is employed by an expert witness." *State v. Price*, 30 Kan. App. 2d 569, 579, 43 P.3d 870 (2002).

Graham argues that because the test was performed by local hospital personnel and because the State did not prove the test had been approved by the Kansas Department of Health and Environment for blood alcohol concentration in criminal cases, the standards set forth in *City of Abilene v. Hall*, 202 Kan. 636, 451 P.2d 188 (1969), are not met. Graham's reliance on *Hall* is misplaced. *Hall* did not require prior approval of the Kansas Department of Health and Environment of new test procedures for admission of evidence. Rather, the *Hall* court turned its attention to whether the expert witness had the necessary qualifications to perform an analysis of the blood alcohol concentration using the particular method of testing in question and to whether the test method was reliable, accurate, and "also generally accepted as such by other experts in the field." 202 Kan. at 643. Moreover, the *Hall* court held that "a properly educated and practicing medical doctor, chemist, medical technologist, biologist, biochemist or toxicologist has the necessary qualifications" to evaluate chemical tests for alcoholic concentration of blood. 202 Kan. at 640.

In *State v. Briggs*, 24 Kan. App. 2d 621, 624, 950 P.2d 273 (1997), *rev. denied* 264 Kan. 822 (1998), the court stated:

"In *City of Abilene v. Hall*, 202 Kan. 636, 640, 451 P.2d 188 (1969), the court stated the general principles of testing for blood alcohol content. The *Hall* court held that a properly educated medical technologist has the necessary qualifications to evaluate chemical tests for alcoholic content of blood. 202 Kan. at 640.

"The *Hall* court adopted the following rule:

'[T]he fact there may be some disagreement on the part of a few in the scientific and medical community as to the reliability of a particular test method is a matter affecting the weight of such evidence and not its admissibility. [Other courts] have held such evidence admissible as long as a qualified expert witness testifies that the particular test method employed in a given case is reliable and accurate in his opinion, and also that it is generally accepted as such by other experts in the field.' 202 Kan. at 641.

"On appeal, Briggs cites *Com. v. Wanner*, 413 Pa. Super. 442, 450, 605 A.2d 805 (1992), where the court held that evidence of the amount of alcohol in a

person's plasma was not sufficient to support a conviction. The *Wanner* court quoted extensively from *Com. v. Bartolacci*, 409 Pa. Super. 456, 458-59, 598 A.2d 287 (1990), where the court required a conversion of the blood serum, and an expert testified that 'when serum blood is tested the results will show a blood alcohol content which can range from between 10 to 20 percent higher than a test performed on whole blood.' "

"The *Frye* test is concerned with whether the expert's opinion is based on a technique that has earned general acceptance in the expert's scientific field as reliable." *Kuhn,* 270 Kan. at 457.

In *Shively,* 268 Kan. at 575-76, we further stated:

"The general acceptance test of *Frye* governs the admissibility of expert scientific evidence in Kansas in those situations wherein such a test or standard is required. [Citation omitted.] As explained in *State v. Warden,* 257 Kan. 94, 108, 891 P.2d 1074 (1995):

'The general rule enunciated in *Frye* prohibits expert testimony concerning a scientific principle or discovery unless the principle is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014. This court has adopted the *Frye* test concerning the admissibility of scientific evidence. [Citations omitted.]

" 'The *Frye* test requires that, before expert scientific opinion may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity generally has not been accepted as reliable or is only regarded as an experimental technique, then expert testimony based on its results should not be admitted into evidence. [Citation omitted.]'

"The party seeking to admit the scientific evidence has the burden of satisfying the *Frye* test by proving the reliability of the underlying scientific theory upon which the evidence is based and the acceptance of it in the appropriate scientific field. [Citations omitted.]"

Here, method is not experimental technique. The technique at issue is used for medical diagnostic purposes. Our determination is thus narrowed to whether the technique's validity is generally accepted as reliable within the scientific field of determining blood alcohol concentration.

Johnson conceded that the hospital's laboratory procedures recommended that the enzyme analysis test results from the Kodak Vitros 250 machine be confirmed by gas chromatography, and admitted the results in this case were not confirmed. Johnson testified that the standard deviation of the enzyme analysis from the gold

standard was 11 milligrams per deciliter, or in the range of a 5½% to 7% positive bias. Johnson admitted on cross-examination that it was possible that the positive bias could result in a reading of .081 blood alcohol concentration when, in fact, it should read .079. Johnson testified, however, that based on his discussions with personnel at the Kansas Department of Health and Environment laboratory and the KBI, he believed the enzyme analysis method for measuring blood alcohol concentration was generally accepted throughout the State of Kansas by courts and forensic scientists.

On appeal, the State presents citations demonstrating that a number of other states have accepted blood alcohol concentration evidence obtained through the enzyme analysis method, either via case law, regulation, or statute. Enzyme analysis is not a novel method for determining blood alcohol concentration; the first journal published on the method appeared in 1951. See R. Bonnichsen & H. Theorell, *An Enzymatic Method for the Microdetermination of Ethanol*, 3 Scand. J. Clinical Lab. Invest. 58 (1951). Further, it is significant that both expert witnesses testified that the enzyme analysis method was commonly used in hospital laboratories and that Zettl agreed hospital laboratory results may be used in life or death situations.

After reviewing the evidence presented to the district court as well as the authority cited by the State and within the *Briggs* case, we conclude that the enzyme analysis technique's validity is generally accepted as reliable within the scientific field of determining blood alcohol concentration. We therefore conclude, as a matter of law, that the enzyme analysis tests to determine blood alcohol concentration meet the requirements of *Frye*, and that the blood test results were admissible at trial.

Because blood alcohol concentration in serum may differ from that in whole blood, we conclude that evidence of the proper conversion from serum to whole blood concentrations is also admissible. See *Briggs*, 24 Kan. App. 2d at 625-26; 1 Fitzgerald, Intoxication Test Evidence § 19:12 and Fig. 29 (2d ed. 1995) (noting that serum or plasma alcohol concentration values register higher than whole blood by an average of 16 percent).

Finally, we note that Graham requested that this court reconsider the issue of whether the State timely docketed its appeal within the 21-day limit under Supreme Court Rule 4.02. We note that at oral argument Graham conceded that the State had timely docketed its appeal. There is no necessity to consider the matter further.

Reversed and remanded.