(197 P.3d 859)
No. 98,442

STACY LEE KUXHAUSEN, *Appellant*, v. TILLMAN PARTNERS, L.P., *Appellees*.

Opinion filed December 12, 2008.

*James L. Wisler,* of Wisler Law Offices, of Lawrence, for appellant.

*Jacqueline M. Sexton* and *Joseph J. Roper,* of Foland, Wickens, Eisfelder, Roper & Hofer, P.C., of Kansas City, Missouri, for appellees.

Before MCANANY, P.J., BUSER and LEBEN, JJ.

LEBEN, J.: When Stacy Kuxhausen reported for work at an accounting firm on a Monday morning in Manhattan, Kansas, she smelled paint and began to feel ill within minutes of entering the building. She said that her eyes burned, that she started to get a sore throat, and that she had to take deep breaths to get enough air. She later learned that epoxy-based paints had been applied in the basement of the building on the preceding Friday and Saturday. Kuxhausen came back to the building twice more over the next few days but stayed for only a few hours each time. She estimated that she spent a total of 8 hours in the building after it had been painted.

Kuxhausen claims that she now has an ongoing sensitivity to a variety of chemicals she encounters in her daily life. She has sued the building owners, claiming that all of this is due to her exposure to paint fumes on either that Monday morning in 2004 or on the two later visits. She sought damages of about $2.5 million.

In support of her claim, Kuxhausen presented a medical doctor's testimony that she suffers from what that doctor and some others call multiple-chemical sensitivity. But most medical authorities say that multiple-chemical sensitivity is not a recognized diagnosis, and the district court ruled that the expert testimony Kuxhausen sought to present wasn't sufficiently reliable to be admitted in a Kansas court. And without expert testimony, Kuxhausen has no claim because it's certainly not self-evident to a layperson that a relatively

brief exposure to paint fumes may lead to permanent sensitivity to a variety of chemicals.

The district court's ruling that expert testimony was needed for Kuxhausen to proceed with her claim was not appealed. So Kuxhausen's claim rests upon the admissibility of her expert's testimony. Specifically, we must determine whether evidence about multiple-chemical sensitivity is admissible under Kansas law and whether, aside from that specific diagnosis, the district court properly excluded the doctor's testimony that Kuxhausen's ongoing problems were caused by her exposure to epoxy-paint fumes. Because Kansas law does not allow for expert opinions drawn from scientific principles that have not earned general acceptance, the district court properly excluded expert testimony that Kuxhausen suffers from multiple-chemical sensitivity, a diagnosis that is not generally accepted. In addition, because Kansas law authorizes a district judge to exclude expert testimony that is based on unsupported assumptions or theoretical speculation, the district court properly excluded expert testimony that Kuxhausen's ongoing problems with exposure to chemicals were caused by her brief exposure to epoxy-paint fumes.

## I. *The District Court Properly Excluded Expert Testimony About Multiple-Chemical Sensitivity.*

In the Kansas Rules of Evidence, the legislature has given trial judges a role in determining when expert testimony may be admitted into evidence. K.S.A. 60-456(b) allows only expert opinions that "the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." Thus, by statute, an expert's opinion must be based on facts or data and be within the expert's field of training.

Kansas courts have applied a qualification to this statutory standard with respect to testimony about a new or experimental scientific technique: we condition the admissibility of expert testimony about new or experimental scientific techniques to ones generally accepted as reliable in the relevant scientific community.

*Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, Syl. ¶¶ 2-3, 14 P.3d 1170 (2000). This limitation is based upon a 1923 case from the District of Columbia, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and is generally referred to as the *Frye* test.

As we will soon discuss in greater detail, multiple-chemical sensitivity is an emerging diagnosis that is accepted by only a limited number of medical doctors. Kansas has applied the *Frye* test when deciding whether to allow testimony about an emerging medical diagnosis. In *State v. Marks*, 231 Kan. 645, 654, 647 P.2d 1292 (1982), the court upheld the district court's admission of expert testimony from a psychiatrist about rape-trauma syndrome because a review of medical literature showed that it was "generally accepted to be a common reaction to sexual assault." Similarly, in *State v Heath*, 264 Kan. 557, 574-75, 577-78, 957 P.2d 449 (1998), the court held that battered-child syndrome was "an accepted medical diagnosis" such that—even though the testimony was subject to the *Frye* test—the district court didn't need to hold a *Frye* hearing because courts had already broadly recognized that this was an accepted diagnosis.

The district court carefully reviewed Kuxhausen's evidence and the arguments about whether multiple-chemical sensitivity was a generally accepted medical diagnosis. The court concluded that it was not: "The position papers of the American Academy of Allergy, Asthma, and Immunology and the American College of Occupational and Environmental Medicine demonstrate irrefutably that [multiple-chemical sensitivity] . . . is anything but an accepted medical diagnosis."

We review the district court's decision on the admissibility of evidence for abuse of discretion, though we independently review its understanding of legal principles. See *State v. Moore*, 287 Kan. 121, 135, 194 P.3d 18 (2008). We also may go beyond the record in reviewing relevant literature to determine whether a particular scientific principle or technique subject to *Frye*, like the medical diagnosis at issue here, has gained general acceptance. See *Marks*, 231 Kan. at 654; *State v. Graham*, 275 Kan. 176, 185, 61 P.3d 662 (2003); *State v. Witte*, 251 Kan. 313, 326-27, 836 P.2d 1110 (1992); Monahan & Walker, *A Judge's Guide to Using Social Science*, 43

Ct. Rev. 156, 162 (2007). But whether we review here only for abuse of discretion or make an independent judgment—and whether we rely only upon the record or go beyond it—the district court's conclusion is well-taken.

The district court and the parties discuss in detail the position statements of the American Academy of Allergy, Asthma, and Immunology (the Academy) and the American College of Occupational and Environmental Medicine (the College). The Academy's paper discusses several other medical organizations' position statements that point out the "shortcomings" of this diagnosis and "the lack of scientific support for and clinical evidence of the alleged toxic effects from environmental chemicals in these particular patients." The Academy reported that several environmentally caused diseases, such as Legionnaires' disease, have been documented. But for the documented diseases caused by environmental contaminants, "patients experience a limited range of symptoms," not broad reactions to multiple chemicals. The Academy concluded that there was no proven causal connection between environmental exposure to chemicals and the broad-based symptoms being reported by some patients:

"[Idiopathic environmental intolerances]—also called environmental illness and multiple chemical sensitivities—has been postulated to be a disease unique to modern industrial society in which certain persons are said to acquire exquisite sensitivity to numerous chemically unrelated environmental substances. The patient experiences wide-ranging symptoms, but evidence of pathology or physiologic dysfunction in such patients has been lacking in studies to date. Because of the subjective nature of the illness, an objective case definition is not possible. Allergic, immunologic, neurotoxic, cytotoxic, pscyhologic, sociologic, and iatrogenic theories have been postulated for both etiology and production of symptoms, but there is an absence of scientific evidence to establish any of these mechanisms as definitive. Most studies to date, however, have found an excess of current and past psychopathology in patients with this diagnosis. The relationship of these findings to the patient's symptoms is also not apparent. Rigorously controlled studies to verify the patient's reported subjective sensitivity to specific environmental chemicals have yet to be done. Moreover, there is no evidence that these patients have any immunologic or neurologic abnormalities. In addition, no form of therapy has yet been shown to alter the patient's illness in a favorable way. *A causal connection between environmental chemicals, foods, and/or drugs and the patient's symptoms continues to be speculative and cannot be based on the results of currently published scientific studies.*" (Emphasis added.)

The Academy prefers the name "idiopathic environmental intolerances" to multiple-chemical sensitivity. Doctors use the term idiopathic to refer to something for which the cause is unknown. The Academy noted that the new name was suggested at a conference sponsored by the World Health Organization because the commonly used name, multiple-chemical sensitivity, makes " 'an unsupported judgment on causation' " and was not based either on " 'accepted theories of underlying mechanisms' " or on "validated clinical criteria for diagnosis." The College agreed that even the name multiple-chemical sensitivity had no scientific basis: "[The College] concurs with many prominent medical organizations that evidence does not yet exist to define [multiple-chemical sensitivity] as a distinct entity." The College concluded that "the relationship of [multiple-chemical sensitivity] to environmental contaminants remains unproven. No scientific basis currently exists for investigating, regulating or managing the environment with the goal of minimizing the incidence or severity of [multiple-chemical sensitivity]."

Kuxhausen's expert, Dr. Henry Kanarek, is an allergist who has his own medical practice. He is a member of the Academy but has not gone through its testing process to obtain board certification. During the 13 years he has had his allergy practice, he has diagnosed more than 100 patients with multiple-chemical sensitivity.

Dr. Kanarek met Kuxhausen one time. All of the objective aspects of the medical examination—including mold and allergy tests—showed either normal or negative results. Based on a 15-minute physical examination and 45 minutes of discussion, Dr. Kanarek diagnosed Kuxhausen with multiple-chemical sensitivity.

Dr. Kanarek concluded that Kuxhausen had multiple-chemical sensitivity based upon her report of her symptoms and her statement that these symptoms—like shortness of breath, burning in her lungs, dry eyes, and loss of smell—started at about the time she was exposed to the paint smell. Other than what Kuxhausen told him, the only thing Dr. Kanarek relied upon for his diagnosis was a material safety data sheet for the paint that was used. That sheet is in our record; it listed various organic compounds found in the paint and noted potential effects, like eye and skin irritation

or even harm to the central nervous system, that could result from overexposure. But neither Dr. Kanarek nor Kuxhausen has cited anything on the sheet that indicates exposure to the paint might lead to increased sensitivity to other chemicals. And although Dr. Kanarek is a member of the Academy, he said he was not aware of any position statement from the Academy saying that multiple-chemical sensitivity is not a valid diagnosis.

So we turn to the key question: Should Dr. Kanarek's opinion that Kuxhausen has multiple-chemical sensitivity be admitted under Kansas evidence law? The *Frye* test applies to the admissibility of an emerging medical diagnosis. *Marks*, 231 Kan. at 654; *Heath*, 264 Kan. at 577-78. The *Frye* test requires that the basis of an expert's opinion "be shown to be generally accepted as reliable within the expert's particular scientific field." *Graham*, 275 Kan. 176, Syl. ¶ 4. But this diagnosis doesn't meet that test. Several medical organizations, including the Academy and the College, have adopted formal statements declaring that the diagnosis of multiple-chemical sensitivity is speculative and unsupported by medical science. And we have not found any more recent position paper of the Academy or the College announcing a change in the acceptance of this diagnosis within the medical community.

Beyond these position statements, two other doctors testified about their examination and treatment of Kuxhausen, but their testimony does not supply a basis to admit Dr. Kanarek's opinion that Kuxhausen suffers from multiple-chemical sensitivity. Dr. Maurice Van Strickland, an allergist, reported that Kuxhausen's physical exam was normal even though she had complaints compatible with chemical exposure. But Dr. Strickland couldn't say whether these symptoms were caused by the paint-smell exposure. Dr. Daniel Doornbos, a pulmonologist, also reported essentially a normal physical exam. He too said that he could not offer any opinion about what had caused Kuxhausen's symptoms; he said it was more a matter of toxicology than anything he was trained in.

Thus far, the district court's decision seems a straightforward application of the *Frye* test as it has been applied in Kansas. Emerging medical diagnoses are subject to *Frye*. Multiple-chemical sensitivity is at best an emerging diagnosis, but it has not gained

general acceptance. The lack of acceptance seems nearly beyond question, especially in the "expert's particular scientific field" as an allergist; the very Academy of allergists that Dr. Kanarek belongs to is one of the many medical organizations that refuses to recognize multiple-chemical sensitivity as a valid medical diagnosis.

Kuxhausen tries to get around this problem by arguing that the *Frye* test does not apply. Her argument relies upon the Kansas Supreme Court's opinion in *Kuhn*, which determined that when an expert provides testimony that is "pure opinion," the *Frye* test does not apply. *Kuhn*, 270 Kan. 443, Syl. ¶ 5. Accordingly, we must determine whether Dr. Kanarek's opinion that Kuxhausen suffers from multiple-chemical sensitivity constitutes pure opinion under *Kuhn*. If so, the opinion still may be admitted even though it otherwise would not pass the *Frye* test.

The *Kuhn* court defined pure opinion as an opinion "developed from inductive reasoning based on the expert's own experience, observation, or research." Inductive reasoning moves from the specific observations of the expert to that expert's general conclusion about them. Such opinions aren't subject to the *Frye* test. By contrast, when an expert reaches a conclusion based on deductive reasoning, that's subject to *Frye*. 270 Kan. 443, Syl. ¶ 5. An expert using deductive reasoning would move from general principles down to the specific instance before him.

Dr. Kanarek testified that multiple-chemical sensitivity was a valid medical diagnosis that was "considered now a catch-all for anybody who has had strong chemical exposures . . . when they have had adverse reactions to them." When asked his basis for multiple-chemical sensitivity as a valid diagnosis, Dr. Kanarek cited "information that has appeared in various articles written in the publications that I've read as well as lectures or discussions." Based on "[a]ll of those things," he said that "multiple chemical sensitivity is a good catch basin."

As he has expressed it, Dr. Kanarek's opinion is based on deductive reasoning, not his own personal observations or research. He has relied upon articles and lectures by others as support for the validity of the diagnosis. Boiled to its essence, his testimony was that multiple-chemical sensitivity is a catch-all diagnosis rep-

resenting certain symptoms; because Kuxhausen has those symptoms, she has multiple-chemical sensitivity. This is a specific conclusion deduced from a general proposition: the classic definition of deductive reasoning. Opinions based on such reasoning must be based on science that has gained general acceptance in the relevant field, which is not the case here.

So far, we have applied the principles announced in *Kuhn* but have not discussed the specific factual situation found there. We have moved in that sequence because we find *Kuhn* factually distinguishable from Kuxhausen's case. But because it is a Kansas Supreme Court decision and is of course binding upon us, we should explain why we do not find it controlling.

In *Kuhn*, Jennifer Bishop, a woman who had given birth to a baby, received a tablet of Parlodel to prevent lactation because she did not plan to breastfeed the baby. Within an hour, she was overcome by nausea, vomiting, fever, and high blood pressure. Hours later, she lapsed into a coma; she died the following day. An autopsy attributed Bishop's death to eclampsia, which is the occurrence of seizures or convulsions in pregnant women, or possibly bacteremia, which is the presence of bacteria in the bloodstream. The plaintiff in *Kuhn* had three well-qualified experts who testified that the woman had preeclampsia, marked by high blood pressure, before Parlodel was given to her. The plaintiff's experts said that the Parlodel made her condition worsen quickly, resulting in cerebral edema and causing her death. The experts said that they relied on the traditional method doctors use in making a diagnosis—using a differential diagnosis where the doctor considers which of two or more diseases with similar symptoms is the one affecting the patient.

In *Kuhn*, a recognized medical diagnosis—eclampsia—was noted as the probable cause of death in the autopsy report. The court found that the experts' use of differential-diagnosis analysis to determine the cause of the eclampsia was pure opinion. All of the experts in *Kuhn* were medical-school professors. In choosing between the potential diagnoses for Bishop's condition, the doctors expressed opinions "developed from inductive reasoning based on the expert's own experience, observation, or research." 270 Kan.

at 456-57. In sum, the doctors looked at the specific circumstances of Bishop's death and used their expertise to make a general conclusion about the likely cause. That's inductive reasoning, which *Kuhn* allows without regard to the *Frye* test.

But there was nothing questionable about the validity of eclampsia as a diagnosis. Unlike multiple-chemical sensitivity, eclampsia is a well-established medical diagnosis. In addition, although no medical studies clearly established that Parlodel could cause eclampsia, Bishop's death came near the end of a 10-year debate between the Food and Drug Administration and Sandoz Pharmaceuticals over the safety of Parlodel for pregnant women. At the FDA's urging, Sandoz withdrew its indication recommending the use of Parlodel to prevent lactation about a year after Bishop died. Thus, the medical and regulatory communities had certainly not rejected the suggestion that Parlodel might have caused eclampsia.

The *Kuhn* court cited two out-of-state cases as persuasive authority. *Kuhn* relied in large part on *Florida Power & Light Co. v. Tursi*, 729 So. 2d 995 (Fla. Dist. App. 1999). In *Tursi*, a man developed a cataract after an electrical transformer leaked a liquid into his eye. An ophthalmologist who treated the man said that several things can cause cataracts, but he eliminated most of them and said based on his experience that the cataract most likely was caused by the transformer liquid. His testimony was allowed as pure opinion. 729 So. 2d at 997. As in *Kuhn*, the diagnosis wasn't debated—the man had a cataract. And as in *Kuhn*, the doctor worked through a standard differential-diagnosis technique starting from the individual case at hand.

*Kuhn* also relied somewhat on *Logerquist v. McVey*, 196 Ariz. 470, 1 P.3d 113 (2000). It's arguably a closer fit for Kuxhausen's case. The plaintiff in *Logerquist* said she had been molested as a child by her pediatrician; she said she had no recollection of the abuse for about 20 years after it occurred until her memory was triggered by a television commercial featuring a doctor. She presented the expert opinion of a psychiatrist who said that severe childhood trauma, such as sexual abuse, can cause a repression of memory, which may come back to the person and be accurately recounted years later. The expert based this opinion in part on "his

experience and observations over many years," as well as upon medical literature. 196 Ariz. at 472. The Arizona Supreme Court reviewed a number of opinions admitting expert opinion in "matters of behavioral science" and concluded that "[o]pinion testimony on human behavior is admissible when relevant . . . and when the witness is qualified." 196 Ariz. at 478-80. The court held that "*Frye* is inapplicable when a qualified witness offers relevant testimony or conclusions based on experience and observation about human behavior for the purpose of explaining that behavior." 196 Ariz. at 480. The court found the expert's opinions were sufficiently based on his own experience. The expert was the director of a trauma center specializing in treating the psychological effects of trauma. He had published seven articles based on his own research, mostly in prestigious and peer-reviewed journals. The court called him "one of the leading researchers and authorities in behavioral science" and remarked that "[i]t would be strange that a witness so well qualified and experienced would not be permitted to testify on an issue beyond the experience of the average juror." 196 Ariz. at 475.

*Logerquist* is more like Kuxhausen's case than *Kuhn* or *Tursi*; *Logerquist* involved a diagnosis that was itself questioned by an opposing expert witness. But the court emphasized that the expert had a vast basis of personal experience and research to draw upon. When relying upon his own experience and personal observation in treating particular patients to establish a more general conclusion about repressed memories, the *Logerquist* expert engaged in inductive reasoning, which *Kuhn* labels pure opinion. We consider Dr. Kanarek's reasoning primarily deductive, not inductive.

Our judgment that Dr. Kanarek's opinion about multiple-chemical sensitivity is inadmissible is consistent with the view of the vast majority of courts in the United States that have addressed this issue. Courts have generally held testimony about the diagnosis of multiple-chemical sensitivity inadmissible, whether under the *Frye* test or the somewhat different test of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), because the diagnosis is not generally accepted in the relevant medical community. See, *e.g.*, *Summers v. Missouri Pacific*

*R.R. System*, 132 F.3d 599, 603 (10th Cir. 1997) (multiple-chemical sensitivity "is a controversial diagnosis that has been excluded under *Daubert* as unsupported by sound scientific reasoning or methodology"); *Bradley v. Brown*, 42 F.3d 434, 438-39 (7th Cir. 1994) (affirming a lower court's *Daubert* analysis rejecting multiple-chemical sensitivity testimony); *Gabbard v. Linn-Benton Housing Authority*, 219 F. Supp. 2d 1130, 1139 (D. Ore. 2002) (multiple-chemical sensitivity "has not attained general acceptance"); *Coffey v. County of Hennepin*, 23 F. Supp. 2d 1081, 1086 (D. Minn. 1998) (excluding expert testimony on multiple-chemical sensitivity because the court "has failed to find an article or a medical association which opines that the methodology of diagnosing [it] has progressed to a point that it is scientific knowledge capable of assisting a fact-finder"); *Frank v. State of New York*, 972 F. Supp. 130, 137 (N.D.N.Y. 1997) ("the testimony on [multiple-chemical sensitivity] proffered by plaintiffs' experts [fails] to meet the standard of evidentiary reliability established in *Daubert*"); *Sanderson v. IFF*, 950 F. Supp. 981, 1002 (C.D. Cal. 1996) (the science of multiple-chemical sensitivity has not progressed beyond the hypothetical); *Minner v. American Mortg. & Guar. Co.*, 791 A.2d 826, 849 (Del. Super. Ct. 2000) (multiple-chemical sensitivity "is not a scientifically valid diagnosis"); *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 595, 840 N.E.2d 300 (2005) (finding no general acceptance of multiple-chemical sensitivity in the medical community and affirming the denial of the expert testimony pursuant to *Frye*); *McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 153-54, 753 N.W.2d 321 (2008) (acknowledging that many courts have determined that multiple-chemical sensitivity is a "controversial diagnosis unsupported by sound scientific reasoning or methodology"); *Collins v. Welch*, 178 Misc. 2d 107, 109, 678 N.Y.S.2d 444 (1998) (concluding that multiple-chemical sensitivity had not gained general acceptance in the relevant scientific community and was thus inadmissible). But see *Kennedy v. Eden Advanced Pest Technologies*, 222 Ore. App. 431, 447-52, 193 P.3d 1030 (2008) (finding that there is a controversy in the medical community about whether multiple-chemical sensitivity is a valid diagnosis but that, after review of *Daubert* factors, the competing evidence should be

presented to the jury); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997) (allowing testimony about toxic encephalopathy under a *Daubert*-like test).

In sum, Kansas applies the *Frye* test to testimony about an emerging medical diagnosis, and the validity of a diagnosis of multiple-chemical sensitivity is not generally accepted. It therefore fails the *Frye* test. Dr. Kanarek's opinion is based primarily on deductive, not inductive, reasoning, so the *Kuhn* exception to applying the *Frye* test does not apply. The district court correctly held that Dr. Kanarek may not testify about multiple-chemical sensitivity.

II. *The District Court Properly Excluded Expert Testimony that Exposure to Paint Fumes Had Caused Kuxhausen's Symptoms.*

After it determined that evidence of a diagnosis of multiple-chemical sensitivity was inadmissible under *Frye*, the district court had to determine whether any expert had given an opinion that Kuxhausen's exposure to paint fumes had caused her symptoms. K.S.A. 60-456(b) again guides the decision: the expert's opinion must be based upon facts or data and within the expert's field of training.

The district court carefully reviewed the evidence submitted by each side. Based upon that review, the district court determined that Dr. Kanarek had not provided a sufficient basis in facts or data upon which to express an opinion that the exposure to paint fumes had caused Kuxhausen's symptoms:

"Dr. Kanarek gave Plaintiff a physical examination and reviewed the records of her prior objective examinations, determining in each case that the results were essentially normal. The Court's review of the proposed uncontroverted facts from Plaintiff and Defendant, and the deposition references from each, has not disclosed an instance where either counsel asked Dr. Kanarek whether, based on reasonable medical probability, he is of the opinion that Plaintiff's exposure to the epoxy paint fumes caused the conditions for which she seeks compensation. Although magic words are not required, the standard is the same.

"Dr. Kanarek's deposition testimony does indicate he had the Material Safety Data sheet (MSDS) for the epoxy paint. He stated, generally, that there were materials on the sheet that 'most definitely can generate that type of illness' and 'many ingredients within this, can lead to very serious health problems.' Although replete with opinions that there are apparently hazardous substances [listed] on the MSDS that *can* make people sick, the Court has no opinion from Dr. Kanarek,

with a supporting basis, that some one or more substances *did make* Plaintiff sick, as she alleges.

"Dr. Kanarek testified that he had no information concerning which chemicals or other substances were present in the air when Plaintiff returned to work, no information whether the MSDS health concerns related to aerolized paint or off-gassing from the paint, no information indicating a level of exposure required to generate eye or skin irritation, and no information about the level of any particular chemical that remains in the air for a particular duration. . . .

". . . As the court commented in *State v. Papen*, 274 Kan. 149, 159 (2002), '[a]n expert must have a factual basis for his or her opinions in order to separate them from mere speculation.' A review of the record presented to the Court, even giving the required weight to Plaintiff's position, falls short of that standard. Broad generalizations about what can or could cause a range of possible illnesses are not a substitute for opinion founded on particular facts, related to the particular circumstances of the person before the court. Those may be opinions that are open to dispute by others duly qualified and also in possession of the relevant facts. The question then becomes the weight the jury chooses to give the competing opinions. Inadequately founded opinions do not assist the jury in fairly resolving the case. Opinion that only invites the jury to speculate on the speculation of the expert should not be admitted under the above standards."

Based on these findings, the district court determined that no expert testimony had been submitted on causation that met the standard of K.S.A. 60-456(b). Without testimony in support of causation, a plaintiff's negligence claim fails. Therefore, the district court granted summary judgment to the defendant.

On her appeal of this ruling, Kuxhausen does not argue that Dr. Kanarek's causation opinion was pure-opinion testimony under *Kuhn*. Rather, she argues that Dr. Kanarek gave a sufficiently clear causation opinion and that it was sufficiently supported by facts and data so that the district court should have admitted it. The district court correctly identified the appropriate legal standards under K.S.A. 60-456(b) for the admission of expert testimony. We therefore review for abuse of discretion its conclusion that no expert testimony on causation met the standard for admission under K.S.A. 60-456(b). See *State v. Moore*, 287 Kan. 121, 135, 194 P.3d 18 (2008); *State v. Brice*, 276 Kan. 758, 775, 80 P.3d 1113 (2003); *State v. Colbert*, 257 Kan. 896, 910, 896 P.2d 1089 (1995). We reverse for abuse of discretion on the admissibility of evidence only when no reasonable person would agree with the decision of

the district court. *Miller v. Glacier Development Co.*, 284 Kan. 476, 505, 161 P.3d 730 (2007). This is not such a case.

Dr. Kanarek admitted in his testimony that he had no information regarding the amount of chemicals Kuxhausen was exposed to. He similarly admitted that he had no information about the level of chemical exposure required to cause irritation for the chemicals found in this paint. However, Kuxhausen is correct in her argument on appeal that the district court went too far in its conclusion that Dr. Kanarek had not expressed a causation opinion at all. Magic words are not required, and Dr. Kanarek did state his opinion that Kuxhausen's problems were caused by the paint-fume exposure. But that caveat on the district court's conclusions has no effect on its determination that Dr. Kanarek didn't cite an adequate basis to reach that causation opinion.

It is precisely because the link between sensitivity to lots of chemicals and specific exposure to one chemical is so questionable that the diagnosis of multiple-chemical sensitivity has not gained acceptance in the medical community. The district court did not abuse its discretion in concluding that Dr. Kanarek had not provided a sufficient factual basis for a causation opinion in this case. See *McNeel*, 276 Neb. at 154 (when basis for causation opinion of multiple-chemical sensitivity is "reduced to nothing more than post hoc, ergo propter hoc," which is relying on the false assumption that the second event to occur must have been caused by the first event, it is not helpful to a jury and therefore not admissible). As the Kansas Supreme Court has said, "[E]xpert testimony must be based on reasonably accurate data and not simply based on unsupported assumption, theoretical speculation, or conclusory allegations." *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 767, 915 P.2d 86 (1996) (affirming district court decision that expert testimony didn't meet standard of K.S.A. 60-456[b]).

## Conclusion

The district court properly determined that Kuxhausen had not presented admissible expert-opinion evidence that she suffered from multiple-chemical sensitivity or that her long-term symptoms were caused by exposure to paint fumes. In the absence of such

evidence, Kuxhausen did not have a viable claim for negligence. Therefore the district court properly granted summary judgment to the defendant.

The judgment of the district court is affirmed.