(199 P.3d 1283)
No. 98,860

MARGARITA MUNOZ, *Appellee,* v. GORDON B. CLARK, M.D., *Appellant.*

Opinion filed January 30, 2009.

James D. Oliver, Thomas L. Theis, and *Bart W. Howk,* of Foulston Siefkin LLP, of Overland Park, for appellant.

*Elizabeth R. Herbert, Pedro L. Irigonegaray,* and *Robert V. Eye,* of Irigonegaray & Associates, of Topeka, for appellee.

Before GREENE, P.J., HILL, J., and BRAZIL, S.J.

HILL, J.: In this medical malpractice case, the evidence suggests that as·a standard of care, when a surgeon has received a report from the pathologist that casts doubt upon what the surgeon thinks he has accomplished with the surgery, then that surgeon must take steps to reconcile the two beliefs. Here, the surgeon chose to ignore the pathologist report and tell the patient and her referring physician that he had successfully removed the patient's ovaries laparoscopically. He had not. They were finally removed 2 years later. After losing in district court, the surgeon raises several issues in this appeal. He contends there is no expert testimony showing his negligence caused the pain and suffering and damages to his former patient. Because there is such evidence, we hold the district court properly denied the surgeon's motion for judgment as a matter of law. We deal with other issues raised by the surgeon, denying any relief but amending the judgment to order the deduction of a small amount for the cost of a sonogram.

*We give a brief history of the plaintiff's condition and treatment history.*

Relevant to this case, Margarita Munoz' medical experiences started on March 13, 2002, when she asked Dr. Josie Norris, her primary care doctor, to remove an intrauterine device, commonly called an IUD. Munoz had been experiencing daily bleeding for 2 months before this appointment. Norris tried but was unable to remove the IUD. So, Norris referred her to Dr. Barnett's office where Dr. Gordon B. Clark treated her. On June 7, 2002, Munoz

consulted with Clark, who performed a physical exam. Clark's office notes show that Munoz was mostly asymptomatic, except for dysmenorrhea, which is painful cramping that occurs during menstruation, and abnormal uterine bleeding.

Clark advised Munoz that her pelvic sonogram showed the presence of a complex adnexal mass arising from her right ovary, which could possibly be a cyst or could be cancerous. Because of her history of ovarian cysts, Clark stated that one alternative treatment for her was the removal of her ovaries through laparoscopic surgery. Munoz chose that alternative.

On August 7, 2002, Clark did the laparoscopic surgery and believed he surgically removed Munoz' ovaries, fallopian tubes, and IUD. Clark sent the removed tissues to a pathologist for examination. From that sample, the pathologist determined that Clark had removed mostly uterine tubes but had only grazed the ovarian surface. As a result, the pathologist stated in her report that "no ovarian tissue is identified on gross examination" and that "the [m]icroscopic features support diagnosis, above."

But Dr. Clark did not contact the pathologist to discuss her findings or conduct any tests that could possibly explain the discrepancy. Instead, he chose not to rely on the pathology report, believing he had successfully removed Munoz' ovaries. Despite the discrepancy between his clinical findings and the pathology report, on August 16, 2002, Clark personally told Munoz that he had removed her ovaries, fallopian tubes, and IUD. And, because he believed he had removed her ovaries, Clark started hormone replacement therapy and prescribed Prempro to ward off surgically induced menopause.

In his other postoperative actions, Dr. Clark continued to manifest his belief that he had removed Munoz' ovaries. He sent a letter to Dr. Norris, the primary care doctor, telling her of his treatment of Munoz. As he did with Munoz, Clark did not advise Norris of the discrepancy between his clinical findings and the pathology report. Instead, Clark told Norris he had removed both of Munoz' ovaries, tubes, and IUD and that he had prescribed Prempro for Munoz. Based on Clark's letter, Dr. Norris assumed Munoz no longer had ovaries and treated her accordingly.

Our review of the record discloses that at least at one point Dr. Clark had doubt about the removal of her ovaries. In his operative report, Clark dictated that he was unable to separately identify the ovaries:

"Following the hysteroscopy the patient underwent laparoscopic evaluation. There were no adnexal masses. By introducing 1 cm trocar through the anterior abdominal wall at inferior aspect of the umbilicus this revealed a complex distinct swollen fallopian tubes wrapped around the posterior aspect of the uterine fundus and heading to the posterior cul de sac. *The ovaries could not be definitively identified separate from the tubo-ovarian complex.*" (Emphasis added.)

Then, in his deposition taken later, Clark indicated that "at the time of surgery, . . . there was no identifiable, normal ovarian tissue structures." When reminded of this statement at trial, Clark conceded that he did state that he would be dependent upon the pathologist's findings but only on the issue of whether there was ovarian cancer or not.

Unaware of this discrepancy after her surgery, Munoz went back to her normal life. She went to work. During this time, Munoz experienced severe abdominal pain, breakthrough bleeding, and premenstrual headaches. But Munoz missed no work because of these symptoms. However, in April 2004, because these symptoms continued, Munoz visited an emergency room. At the hospital, the doctors conducted an ultrasound examination of her pelvis as well as a CT scan. The reason for the CT scan was because the emergency room physician's physical examination of Munoz revealed a mass in her uterus. This was problematic since Munoz allegedly did not have ovaries. The sonogram report stated: "In view what appear to be prominent cystic changes in both adnexal areas, *we are requesting a CT scan of the pelvis* to help better delineate these fluid-filled structures *in view of the history according to the patient of the ovaries being removed.*" (Emphasis added.)

The test results cast doubt on the belief that Munoz had no ovaries. After the results of the CT scan were received, Munoz was notified that "they found abnormal findings on the CT scan and that it was very important that she go right away to see a gynecologic surgeon because we didn't know what indeed this mass was in her pelvis." The CT scan report specifically stated that the ap-

pearance of the large lobulated multicystic mass "suggests ovarian neoplasm." An ovarian neoplasm is a tumor of the ovary.

Concerned by this, Munoz consulted with Dr. Michael Morrison, an obstetrician and gynecologist. Morrison diagnosed Munoz' condition as endometriosis, which is an inflammatory response in the tissues that leads to adhesion formation. This condition can cause severe pelvic pain. Morrison further determined that the specific cause of Munoz' pelvic pain came from her endometriomas and adhesions. He said endometriomas in itself refers to ovaries containing endometrial tissues. In other words, her ovaries were causing her pain.

Morrison then told Munoz that he believed her ovaries might still be in her body because ovaries do not regenerate, even if a surgeon cuts off a piece of an ovary. Morrison based his belief that Munoz still had her ovaries, in part, on the discrepancy between Clark's operative report and the pathology report. With this belief in mind, Dr. Morrison discontinued Munoz' hormone replacement therapy, thinking that the Prempro may have some association with her breakthrough bleeding. Then, on June 11, 2004, Dr. Morrison surgically removed Munoz' uterus and ovaries. He sent the removed tissues to a pathologist who confirmed the removal of those organs and structures.

A lawsuit followed with conflicting claims from both sides. In March 2006, Munoz sued Dr. Clark for medical malpractice. She claimed Clark had failed to reconcile his belief that he had surgically removed her ovaries with the pathologist's report that no ovarian tissue was removed, except for some tiny microscopic slices. Munoz contended this conduct fell below the appropriate professional standard and caused her damage. In opposition, Dr. Clark maintained throughout the proceedings the same line of defense. Munoz had no expert evidence proving his deviation from the standards of professional conduct as the cause of Munoz' subsequent medical complaints of pain and bleeding and headaches. In his defense, Clark contended those complaints were the result of disease, not his negligence. Clark took this position first with a motion for summary judgment, then a motion for judgment as a matter of

law, then a posttrial motion for judgment notwithstanding the verdict. And now, Clark presses the same argument in this appeal.

*We frame the issue and reveal our standard of review.*

We note that Dr. Clark did not appeal the jury's finding that he breached the professional standard of care when he failed to resolve or explore the contradiction between his clinical findings and the pathologist's report. Basically, Clark makes a causation argument. He contends that Munoz has presented no expert evidence connecting his negligence with Munoz' pelvic pain, breakthrough bleeding, and premenstrual headaches. In his view, for lack of this evidence, the district court should have dismissed this case as a result.

In response, Munoz contends that expert testimony is not required in every case of medical malpractice. In her view, a jury should be able to make inferences of causation from medical records. Further, she contends that there are cases where the cause of an injury is so obvious the average person from common knowledge and experience can decide the matter. This is often called the "common knowledge" exception.

Before addressing this argument, we establish our standard of review. It is important for an appellate court to state what standard of review it will use while deciding an issue. By doing so, the parties in the appeal will know by what rules the court acted and all future parties will know the proper standard. Here we deal with Clark's motion for judgment as a matter of law (these used to be called motions for directed verdict) and his motion for judgment notwithstanding the verdict.

We use the same standard for both motions. A trial court's decision on a motion for judgment as a matter of law is reviewed under the former directed verdict standard of review. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007). A denial of a judgment notwithstanding the verdict is similarly reviewed under the same test as a motion for directed verdict. *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 126-27, 815 P.2d 72 (1991). Thus, this court applies the following standard.

When reviewing the grant or denial of a motion for directed verdict, the appellate court—like the trial court—must resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the ruling is sought and determine whether evidence exists upon which a jury could find a verdict for that party. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. However, when no evidence is presented on an issue or where the evidence is undisputed and the minds of reasonable persons may not draw differing inferences or arrive at opposing conclusions, it is a question of law for the court's determination. See *Smith*, 285 Kan. at 40; *Brown*, 249 Kan. at 126-27.

*We review some legal fundamentals concerning medical malpractice.*

"Medical malpractice is negligence of a healthcare professional in the diagnosis, care, and treatment of a patient." *Perkins v. Susan B. Allen Memorial Hospital*, 36 Kan. App. 2d 885, 888, 146 P.3d 1102 (2006). In a medical malpractice case, the plaintiff must prove the following elements:

"(1) The physician owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the physician breached this duty or deviated from the applicable standard of care; and (3) the patient was injured and the injury proximately resulted from the physician's breach of the standard of care. [Citations omitted.]" *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008).

The elements of negligence are never presumed. Therefore, expert testimony is generally required to establish the appropriate standard of care and causation because such matters are outside the knowledge of the average person without specialized training. See *Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001); *Perkins*, 36 Kan. App. 2d at 889. In certain medical malpractice claims, expert testimony is not required because the standard of care and causation are within the common knowledge of a layperson. *Perkins*, 36 Kan. App. 2d at 889; *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258, 59 P.3d 1021 (2002). But, the application of the common knowledge exception is extremely limited. See, *e.g.*, *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 963, 317 P.2d 472 (1957).

Both sides urge us to view the law in their favor. Dr. Clark wants us to hold that expert testimony concerning causation is required in every case. It is not. If we did so rule, we would eliminate the common knowledge exception to the requirement for expert testimony, and that is a ruling we cannot make. Margarita Munoz asks us to rule that the common knowledge exception applies here. It does not. We hold that the common knowledge exception is inapplicable here. This is not a case of a surgeon operating on the wrong limb, or a case where a patient is dropped from a table. See generally *Perkins*, 36 Kan. App. 2d at 889 (setting forth several examples where the exception has been applied in Kansas). Rather, the facts here show that while laparoscopic surgery is minimally invasive, it still requires great skill and professional training. It is a subset of surgery practiced by those specially trained. What must be done—peering into a television monitor, trying to identify various tissues and organs, distinguishing healthy tissue from diseased, and attempting to remove the diseased by making small subtle movements with tiny instruments—requires skills and knowledge beyond common knowledge and experience.

*We show the evidence of the applicable standard of care.*

Three doctors offered expert testimony for Margarita Munoz, but only two talked about the professional standard of care appropriate for this case. Conrad J. Duncan, M.D., described the proper steps that should have been taken by Clark and then explained to the jury how Clark failed to meet that professional standard. Dr. Morrison testified about how a surgeon should keep a referring physician up to date with accurate information about all procedures used and the resulting condition of their common patient.

We look first at the testimony of Dr. Duncan, a gynecologist who performs minimally invasive gynecological surgery. After reviewing medical records from Munoz' two surgeries—the laparoscopic procedure done by Clark, and the complete hysterectomy performed by Morrison—Duncan offered his expert opinion of the appropriate standard of care. He focused on the discrepancy between Clark's surgical findings and the pathologist's finding that no ovaries were found in the tissues cut from Munoz' body. Dun-

can made no condemnation of Clark's surgery but found what he failed to do afterwards negligent.

Dr. Duncan maintained the surgeon who received such a pathology report must not shrug it off and ignore it. In his view, when receiving such a report a surgeon should assume "what you sent to the pathologist wasn't what you thought you sent." The surgeon must then take steps to explain the differences between his surgical findings and the pathological findings. Duncan pointed out that Clark failed to employ simple tests after the surgery to decide if Munoz still had her ovaries; a CT scan, an ultrasound examination, or a blood test for a hormone that elevates quickly in a woman's blood after the ovaries are removed. Duncan said Clark's failure to perform these tests and discover the reason for the discrepancy with the pathologist's report breached the professional standard of care.

Then, Dr. Morrison testified about the professional standards of conduct concerning communication between doctors treating the same patient. Simply put, a surgeon must tell the primary care physician about the surgical procedures performed in a case and the resulting physical condition of the patient. In his opinion, Morrison asserted the correct standard of care included telling the referring physician "what you thought you did to the patient, and— I would also send a copy of the pathology report." Further, Morrison thought the proper standard of care includes raising any discrepancies between surgical and pathological findings, not ignoring them.

*There is expert causation evidence in the record on appeal.*

Moving on, we examined the record on appeal for competent evidence of injury caused by Clark's negligence. The record indicates that expert testimony supported Munoz' claim that Clark's failure to resolve the discrepancy between his findings and the pathology report caused her pelvic pain. At trial, Morrison testified that Munoz' pelvic pain came from her endometriomas and adhesions. Although she complained of cramping during menstruation, Munoz had not suffered chronic pelvic pain when she first consulted with Dr. Norris. This pelvic pain condition started after

the laparoscopy. Morrison defined endometriomas to be "ovaries containing endometrial tissue." Thus, Clark's failure to follow the standard of care and explore the reasons why the pathologist's report stated no ovarian tissue was found meant that Munoz' ovaries remained in her body, a condition unknown by any health care professional providing her treatment or the patient herself. No further steps were taken to remove them. Since they remained within her, Munoz' condition worsened and the now liquid-filled ovaries caused Munoz to suffer pelvic pain between 2002 and 2004. The jury could justly conclude from such evidence that Munoz suffered injury caused by Dr. Clark's negligence.

We follow our standard of review. Having drawn all inferences from the facts in favor of Munoz, the party against whom the motion was sought, we hold that competent professional evidence exists from which a jury could find a verdict in favor of Munoz. We uphold the trial court's ruling on the motions.

Since Munoz presented expert causation testimony, we will not address two of Clark's subsequent appellate issues. Obviously, since we held there is expert causation evidence for pelvic pain, that evidence serves as a platform to support a jury award of noneconomic damages. Clark contended that with no expert opinion there could be no award for noneconomic damages. This was Clark's second issue. His fourth issue, a claim that the court erred for failing to instruct the jury that only expert medical testimony can establish causation, is moot because there is expert testimony here. We will explore that claim no further.

Instead, we will look at Clark's remaining two issues. Next, he contends the medical expenses awarded by the jury were contrary to the evidence. For his final point, Dr. Clark urges us to rule that the trial judge abused his discretion by permitting Dr. Duncan to testify about matters beyond those contained in his report. We are not moved to reverse by either issue, but we will address them in that order.

*The claim about medical expenses has changed.*

Initially Dr. Clark argued that the jury's verdict did not comply with one of the exhibits. He later discovered that he was using an

incorrect copy of the exhibit and has modified his request to us accordingly. Clark continues his attack on the expenses for the CT scan, the hormone replacement therapy, and the emergency room costs. Clark argues that if he had tried to reconcile the discrepancy between his clinical findings and the pathology report, he would have ordered the CT scan, and when it revealed the presence of her ovaries, he would have removed them in a later surgery and treated Munoz with hormone replacement therapy. Because Munoz would have incurred these costs even if properly treated, Clark requests the jury's verdict for medical expenses be reversed. Munoz agrees with Clark that the cost of a sonogram should not have been included in the judgment and asks that a reduction of $129.36 be made.

Our standard of review on this point is clear. When a party challenges a jury verdict for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the appellate court should not intervene. *City of Mission Hills v. Sexton*, 284 Kan. 414, 422, 160 P.3d 812 (2007).

The evidence fails to prove that Munoz would have incurred the expense of a CT scan had Clark treated her properly. First, Norris testified that she would not have ordered the CT scan:

"Q [Clark's counsel]. And assuming Dr. Morrison told this jury that in light of the findings of the sonogram, even if he would have known that she still had her ovaries, he would have likely ordered the CT, you don't have any reason to disagree with that, would you?

"A. *No, I just wouldn't have ordered it.*" (Emphasis added.)

Second, Dr. Morrison indicated he would have ordered the CT scan if "it looked like a neoplasm," but Munoz' sonogram report did not indicate the presence of a neoplasm—that finding came from the CT scan. Third, Dr. Duncan opined that in Munoz' case, the only testing required to resolve the discrepancy was a blood test or ultrasound.

Likewise, the evidence does not allow this court to conclude, as Clark suggests, that Munoz would immediately have been treated

with hormone replacement therapy had Clark properly followed the standard of care. For example, even though Munoz had her surgery with Morrison on June 11, 2004, when her ovaries were really removed and she knew it the facts show that Munoz did not start taking hormone replacement medications until July 22, 2004, over a month later.

Also, we must include the costs of unnecessary treatment, namely the hormone replacement therapy as damage flowing from Clark's negligence. There is no need to guard against postsurgical menopause with hormone replacement therapy if the organs that produce that hormone remain within the body. Munoz' primary care physician was unaware of the presence of ovaries until after the surgery performed by Morrison. Her statement on the point is forthright and undeniable:

"Q [Munoz' counsel]. Dr. Norris, had you known on August 28th, 2002, that Dr. Clark missed the ovaries, would your course of treatment of Margarita Munoz have been any different?

"A. *Well, she would not have been on hormone replacement therapy.*" (Emphasis added.)

Next, in our view, the evidence shows that Munoz went to the emergency room for abdominal pain. Munoz' pelvic pain was a proximate result from Clark's breach of standard of care. Therefore, had Clark followed the standard of care, Munoz would not have incurred this emergency room expense. Viewing this evidence in the light most favorable to Munoz, as we are required by law to do, there is no reason for us to modify this judgment except for the expenses of the sonogram. We will remand for the district court to make that simple reduction.

In his final issue on appeal, Clark maintains that Dr. Duncan, the expert witness hired by the plaintiff, was set free by the district court to offer several opinions to the jury that could not be found in his report or his deposition. The district court allowed Duncan to tell the jury what he would have told Munoz in this case; also he told the jury the standard of care applicable here included telling the patient his surgical findings did not correspond with the pathologist's report; further, he told the jury that surgeons should tell their patients the truth. Duncan also offered the opinion that

surgeons should report to the referring physicians and be truthful with them as well. In Clark's opinion, this wide range of opinions offered suddenly at trial crippled his ability to prepare a defense and rebut them.

We review this issue under an abuse of discretion standard. "The admission of expert testimony lies within the sound discretion of the trial court. Its decision will not be overturned absent an abuse of such discretion. [Citation omitted.] One who asserts an abuse of discretion bears the burden of showing such abuse. [Citation omitted.]" *Irvin v. Smith*, 272 Kan. 112, 125, 31 P.3d 934, (2001). We also point out that K.S.A. 60-456(b) comes into play here. That statute permits an expert to continue to form opinions even at the trial:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

See also *Plains Transp. of Kan., Inc. v. King*, 224 Kan. 17, 21, 578 P.2d 1095 (1978) ("The introduction of opinion or expert testimony is controlled by K.S.A. 60-456. An expert must base his testimony upon facts personally perceived by or known to him or made known to him at the hearing.").

Here, Duncan's opinion of how he would advise Munoz of the discrepancy and his interpretation of the photograph of Clark's surgery was based on facts made known to him at the jury trial. Furthermore, Duncan's opinion was within the scope of his special knowledge, skill, and experience. Therefore, this evidence was admissible under K.S.A. 60-456(b).

The district court denied Clark's motions on the basis that Duncan did not exceed the scope of his earlier sworn statement. Duncan's expert report provided the following medical opinion:

"**Medical opinion:** It is my opinion that the postoperative care of Ms. Munoz was a deviation from the standard of care. Standard of care dictates that discrepancies of findings at the time of surgery and final pathology findings must be reconciled. Either the surgical diagnosis is changed and modified or additional

evaluation of the pathology specimen needs to be performed to ensure the two are reconciled.

"Not only was the discrepancy not investigated, Ms. Munoz was erroneously treated for a condition that she did not have, surgical menopause. This occurred as a direct result of not reconciling discrepancies.

"There is clear evidence that *Ms. Munoz's ovaries were not removed at the time of surgery with Dr. Clark and that he subsequently reported that they had been removed* and he treated Ms. Munoz medically as they had been removed. *This is a clear deviation from the standard of care.*" (Emphasis added.)

In Duncan's expert report, he set forth an opinion that Clark violated the standards of care by inaccurately reporting that Munoz' ovaries were removed. At trial, Duncan specified that Clark's error in reporting was directed at Munoz and Norris. Therefore, the district court was correct in finding that Duncan's testimony did not exceed the scope of his opinions beyond his previous disclosures. Finally, we question whether Clark could raise a defense against telling his patients and their referring physicians the truth. We find no merit in this issue.

Affirmed in part, reversed in part, and remanded to subtract $129.36 from the judgment awarded to Margarita Munoz.