No. 122,494

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NORMA NAJERA and TERI SHOPE,
*Appellants*,

v.

GENERAL PEST CONTROL, LLC (CITY OF MOSCOW and EMC INSURANCE),
*Appellees*.

SYLLABUS BY THE COURT

1.

Under these facts, defendants are not entitled to judgment as a matter of law on the issue of causation where circumstantial evidence could cause reasonable people to disagree on whether plaintiffs' exposure to pesticides proximately caused their alleged medical conditions.

2.

In an action for negligence, the plaintiff's claim is properly submitted to the fact-finder on the element of causation when the evidence furnishes a reasonable basis for the conclusion that the defendant's conduct more likely than not caused the plaintiff's injury.

3.

To support a finding of causation, circumstantial evidence need not rise to the degree of certainty that would exclude any and every other reasonable conclusion. Such evidence is sufficient if it affords a basis for a reasonable inference of the occurrence of the fact in issue, although another inference may be equally reasonable.

4.

Under the facts of this case, the plaintiffs were not required to show the exact amount of toxin touched, inhaled, or otherwise consumed to support causation of a generally accepted medical diagnosis.

Appeal from Stevens District Court; BRADLEY E. AMBROSIER, judge. Opinion filed December 10, 2021. Reversed and remanded with directions.

*Razmi M. Tahirkheli*, of Tahirkheli & Premer-Chavez Law Office, L.L.C., of Kansas City, for appellants.

*Bradley C. Nielsen*, of Franke Schultz & Mullen, P.C., of Kansas City, Missouri, for appellees.

Before MALONE, P.J., WARNER and HURST, JJ.

HURST, J.:  Norma Najera and Teri Shope (Plaintiffs) appeal from the district court's directed verdict for defendants General Pest Control, LLC (GPC), City of Moscow, and EMC Insurance (collectively Defendants) on Plaintiffs' negligence claims, and the district court's denial of their punitive damages claims. Plaintiffs each sued GPC for damages allegedly resulting from GPC's negligent application of pesticides. After Plaintiffs presented their case, the district court granted Defendants' motion for judgment as a matter of law finding that Plaintiffs failed to prove causation. When competent evidence exists, as it does here, causation in a negligence claim is appropriately a question of fact for the jury. The district court's judgment as a matter of law is reversed and remanded. As explained herein, this court does not reach Plaintiffs' claims for punitive damages.

2

FACTUAL AND PROCEDURAL BACKGROUND

Najera and Shope worked for the City of Moscow, Kansas (the City) in a city-owned building (the Office Building). On August 25, 2015, GPC sprayed the Office Building for insect pests. GPC had sprayed the Office Building before for similar insect pests. Najera and Shope each filed claims against GPC alleging they suffered medical injury associated with acute and/or chronic exposure to the pesticides sprayed in the Office Building on August 25, 2015.

The City and EMC Insurance Company, the City's workers compensation insurance carrier, intervened. The district court consolidated Najera and Shope's cases with each other, and with cases brought by two others—Stephanie Schraeder and Jon Lund—who also worked in the Office Building. Najera and Shope both sought to amend their petitions to include a claim for punitive damages, and the district court denied both. In the pretrial order, the court stated that they could "renew their motion for punitive damages depending on evidence discovered or presented during or before trial."

After some amount of discovery, GPC moved the district court to reconsider its consolidation order, arguing that the Plaintiffs' medical claims diverged from the other plaintiffs in the consolidated case. The district court agreed and ordered that the four separate cases should be heard in two trials, with Schraeder and Lund in one trial and the Plaintiffs, Najera and Shope, in the other. Plaintiffs presented their case in November 2019, and Defendants moved for judgment as a matter of law claiming Plaintiffs failed to submit sufficient evidence demonstrating causation. The district court agreed and entered judgment for Defendants on all claims, ruling that "Plaintiffs have failed to meet their burden of proof on the issue of causation." The district court gave little other indication for the basis of its opinion.

The Plaintiffs appealed the district court's denial of their motions to amend their petitions to include claims for punitive damages and its grant of judgment as a matter of law in favor of Defendants.

*The August Insecticide Spray and Plaintiffs' Potential Exposure*

GPC employees Paul Wilson and Trent Leal were already onsite on August 25, 2015, when Najera arrived to work. Sometime shortly after 8 a.m., Najera was in the Office Building at her desk taking a phone call when Leal began spraying pesticide near and around her desk. The Office Building is a compact area, measuring only about 750 square feet with two windows that do not open and two doors, one on each end of the space.

Najera testified that Leal sprayed a large amount around her desk and Najera believed that was because she heard Wilson tell Leal that she was afraid of spiders. Najera testified that as soon as Leal began spraying, she started to smell a "horrific" smell and her eyes started watering. Najera further testified that the spray "had a real pungent smell" that was "really, really bad." Najera called City Supervisor John Lund and asked him to come to the Office Building because the smell from the spray was awful and making her eyes water. Lund was not immediately available.

Sometime between 10 a.m. and 10:30 a.m. on that same day, Shope came to the Office Building to retrieve paperwork and commented about the foul odor. Najera and Shope then opened the doors to air out the Office Building and try to alleviate the smell. After about 15 minutes, Shope left because she did not want to continue to smell the odor. Najera remained in the office until her lunch break around noon, when she left for a short period to get a sandwich. She then returned and ate her lunch in the Office Building. Lund arrived at the Office Building sometime after noon that day, and agreed the smell

4

was horrible. Lund asked Najera to call Wilson about the smell. She called and left a message about the smell and requested a return call.

Wilson returned Najera's call at about 2 p.m. and Najera put the call on speaker so that Lund could also listen. Najera testified that she told Wilson "'It smells like poop, like rotten cabbage.'" Najera testified that after she described the smell, Wilson became "really quiet" and said he would call her back. Wilson called back again at about 4 p.m. as Lund and Najera were leaving the office because of nausea and watery eyes. Once again, Najera put the phone on speaker and, according to Najera, Wilson told her that they had inadvertently mixed chemicals they used the night before with the chemical typically used in the Office Building. Najera asked if they would be safe to use the Office Building and Wilson assured her the chemicals were safe and that he would come to the Office Building the next morning with citrus deodorizers.

Najera returned to work the next day, arriving at approximately 12 p.m. Wilson was there along with several others. Wilson told Najera that he believed they confirmed the inadvertent mixture of two chemicals and Najera asked him to write down the names of the chemicals. Najera said she asked because, as the city clerk, she had to answer questions about the smell. She also asked Wilson, whom she considered a friend because they attended the same church, if the employees were safe to be in the Office Building. Wilson assured Najera the chemicals were safe and stated that GPC uses them in hospitals and restaurants. Wilson also gave her a note with his cell phone number and the names of the chemicals used:  "Tandem EPA # 100-1437" and "Orthene PCO Pellets EPA # 5481-8973."

*The Mitigation Efforts at the Office Building*

The City repeatedly tried to mitigate or eliminate the odor in the Office Building. At some point, Wilson returned and applied a citrus deodorizer. On September 23, GPC

paid a professional carpet cleaning service to shampoo the carpet in the Office Building. Najera believed the Office Building smelled even worse after that carpet shampooing. The next day, on September 24, a professional restoration company used a negative air fan/air scrubber for 24 hours followed by a hydrogen peroxide treatment to wipe down walls and all the surfaces, including the baseboards. The restoration company also applied a biological cleaning agent, with a second attempt at air purification, and steam cleaned the carpet two more times. They applied a product known as "enviro-mist" to the air to remove the smell and scrubbed the carpet by hand. The City mayor reported that after all of the restoration efforts, the odor and irritation-causing agents were still present.

In October 2015, a little over a month after the pesticide application and multiple failed restoration and odor removal efforts, the City closed the Office Building. The City employees moved to work at a new location in the senior center. Lund testified that the City closed the Office Building because of the odor and people were getting sick. Najera, Shope, and Lund each testified that the smell remained in the Office Building long after it was vacated. Lund said the smell was still there the last time he visited, which was two or three years after the Office Building closed. The Office Building remained closed at the time of trial.

On October 2, 2015, the City mayor sent a memo to the Kansas Department of Health and Environment (KDHE) regarding the Office Building. The mayor stated that employees who worked in the Office Building reported negative health effects after the pesticide application. The mayor explained the mitigation efforts and reported that two employees had missed at least seven days of work and reported nausea, vomiting, respiratory problems, headaches, sore throats, burning sensation in their lips, and that other employees and visitors reported similar conditions. KDHE referred the issue to the Kansas Department of Agriculture which concluded that it did not identify a misapplication of pesticide.

6

In July 2016, about 11 months after GPC's pesticide application, the Environmental Protection Agency (EPA) sent a Superfund Technical Assessment and Response Team to assess the Office Building. The EPA collected air and wipe samples of the carpet and walls to determine whether the pesticides applied presented a threat to human health. They conducted the assessment "in response to illnesses reported by individuals who worked in the building following application of those pesticides in 2015."

The EPA analyzed air and surface wipe samples inside the Office Building for the five active ingredients in the pesticides Talstar, Orthene, Tandem, and Maxforce FC Roach Killer Bait Gel. The EPA's interior analysis included six air samples, six surface wipe samples, and two carpet samples. The surface wipe sample tests revealed low concentrations of the active ingredients in Talstar, Tandem, and Orthene. Acephate, the active ingredient in Orthene PCO Pellets, was detected in five of the six surface wipe samples, with the highest concentration on the baseboard and adjacent drywall along the southwest wall in the rear room. Four of the six wipe samples found the active ingredient for Talstar and all six found both active ingredients for Tandem present. Both carpet samples contained the active ingredients for Talstar and Tandem but did not detect the active ingredient for Orthene. The air samples only contained low levels of one of two active ingredients of Tandem, and no others. The EPA Summary stated that "[n]o health-based standards have been established by a U.S. government agency for any of these pesticides in the sampled media." It also stated that "airborne pesticides/contaminants other than those specified as analytes during this assessment could have caused the aforementioned health effects reported by workers in the [Office Building]." It also stated that the EPA would determine whether it required further testing or remediation.

*Plaintiff Najera's Exposure to the Pesticides*

Najera spent around seven to eight hours inside the Office Building on the day GPC applied the pesticide. After that, Najera continued working at the Office Building for the remainder of the week—although she ultimately took sick days that Friday and the following Monday. Najera testified she continued to work in the Office Building "on and off" until the City moved her location to the senior center, about five weeks later. Even after the staff began working out of the senior center, Najera testified she still had to "keep going back" inside the Office Building to retrieve various items from file cabinets left behind.

*Plaintiff Najera's Symptoms and Medical Diagnosis*

Najera testified that within 30 minutes to an hour of Leal spraying the pesticides her feet and the side of her mouth around her cheek started tingling, she felt "really, really nauseous," and had a bad headache. Najera still did not feel well when she went home that day. Her headache began to diminish, but her throat felt raw, and her nose felt uncomfortable. When she woke up the next morning, her eyes were abnormally gummy. When Najera stayed home from Friday until Tuesday, some of her symptoms abated. Yet she developed a new feeling of unexplained heat on the bottom of her feet, as well as a tightness in her chest. She returned to work, but the odor was still present and each time she returned she felt "sicker and sicker."

Najera went to the doctor for the first time a week or two after the onset of symptoms and continued seeing the doctor at various times during her illness. A little over a month after GPC employees sprayed the Office Building Najera was still feeling sick and was losing sleep because of a severe cough. Around this time, the City moved the operations in the Office Building to the Moscow senior center. After Najera began working out of the senior center her breathing got better. She continued to experience a

8

tingling, heat sensation in her feet and hands and was occasionally unable to bear weight on her right foot. The burning and tingling sensation in Najera's hands and feet began to get progressively worse and remained at the time of trial. She was also still experiencing issues with balance and difficulty concentrating. Najera quit working for the City in September 2018 because her health was declining. She also had to stop boarding and training horses because of her health problems.

Dr. Eva Henry, a medical doctor that specializes in neurology, testified that she began treating Najera about a year after the initial pesticide exposure. Dr. Henry testified she interviewed and conducted a physical exam on Najera, reviewed Najera's medical records, and ordered medical testing on Najera's blood and urine, which showed she had elevated levels of Benzene, Styrene, and Bisphenol A in her blood and urine. Dr. Henry testified she did not know whether Benzene or Styrene were associated with neuropathic illnesses caused by environmental toxic exposure. These tests did not measure whether or what amount of Orthene was in Najera's body at that time.

Dr. Henry's medical report states that "there [is] no question that Ms. Najera had an acute overexposure of toxin Tandem and Orthene." Dr. Henry testified that Najera had some preexisting conditions, including hypothyroidism, that made Najera more susceptible to environmental toxin exposure. Dr. Henry diagnosed Najera with polyneuropathy from toxic environment exposure, thyroiditis, vitamin D deficiency, chronic fatigue, and fibromyalgia. Dr. Henry testified that symptoms of polyneuropathy from toxic environment exposure can include burning, numbness, and pain in the toes and fingers that can spread to other parts of those extremities, as well as balance issues. During Dr. Henry's treatment of Najera, her polyneuropathy symptoms worsened. Dr. Henry prescribed Najera a medication to reduce her "neuropathic pain"—essentially, the burning sensation and nerve pain Najera was experiencing.

9

Dr. Henry testified that Najera had been diagnosed with chronic fatigue, fibromyalgia, thyroid issues, and a vitamin D deficiency prior to Dr. Henry's additional diagnosis of polyneuropathy. Dr. Henry testified that her report correctly stated her belief that all of these conditions were "due to [Najera's] underlying health issues and toxic exposure," but could not provide an apportionment as to what percentage of Najera's medical conditions were due to Orthene or Tandem exposure. Dr. Henry's medical report did state that Najera "sustained a rather heavy dose of acute organophosphate neurotoxicity starting on August 25, 2015" and this period of exposure "precipitated [Najera's] now documented severe peripheral polyneuropathy." In a later report, Dr. Henry wrote that she suspected Najera's "chronic and acute pesticide exposure" caused her polyneuropathy.

*Plaintiff Shope's Exposure to the Pesticides*

Shope testified that she worked for the City from January 2015 to September 2017. Shope only spent about 15 minutes in the Office Building the day of the pesticide application but worked 2 full days later that week. She testified that when she walked into the Office Building the day of the pesticide application, there was an overwhelming and terrible smell. Shope normally worked in the Office Building Mondays, Wednesdays, and Fridays. After the City closed the Office Building and moved the staff to the senior center in early October, Shope testified she returned to the Office Building about every other day to get mail and payments. Shope did this for "quite a few months" after the Office Building closed and said that the smell remained over that span of time.

*Plaintiff Shope's Symptoms and Medical Diagnosis*

Shope worked the day after GPC employees sprayed the pesticide and said she developed a slight headache and was uncomfortable from "feeling, smelling, and tasting" the chemicals all day. She said she "could feel it extremely on [her] lips and [her] skin."

10

After moving to the senior center, Shope still experienced minor headaches and began to have cold sores that were "out of control." Shope suffered from a burning sensation on her left fingers and right toes, nerve damage, constant cold sores in and on her mouth, damage to her right eye, vision change, and a general feeling of being unwell. Shope testified that she was still experiencing increased cold sores and issues with her eye at the time of trial.

Dr. Henry testified that she also diagnosed Shope after conducting a physical examination of Shope and ordered medical testing on Shope's blood and urine. These tests did not measure whether, or what amount, of Orthene was in Shope's body, but they did find Shope had elevated levels of Styrene in her blood. Dr. Henry testified that she did not know whether Styrene was associated with neuropathic illnesses caused by environmental toxin exposure. Dr. Henry had Shope undergo a nerve biopsy, which found Shope had "significant reduced nerve fiber density on her right foot and calf, indicating signs of neuropathy."

Dr. Henry diagnosed Shope with peripheral neuropathy and testified "that condition within the reasonable medical probability in my opinion was related to her exposure" to the pesticides sprayed in the Office Building. However, Dr. Henry could not conclude that Shope's exposure in the office "was the *primary* factor for her symptoms and polyneuropathy." (Emphasis added.) In her medical report, Dr. Henry wrote that "[t]he direct etiology" of Shope's peripheral neuropathy "is unclear now because there are many possible causes of acquired polyneuropathy," and "[o]ne possibility is acute [or] chronic toxic environmental exposure." Dr. Henry also testified that upon reviewing Shope's medical records, another doctor had previously diagnosed Shope with nerve problems. Shope's medical history reveals that in June 2015, before the pesticide exposure, she had a nerve conduction study done that suggested she had either "peripheral neuropathy or lumbosacral radiculopathy."

11

*Testimony of Dr. Paul Goldstein*

Dr. Paul Goldstein, a professor of toxicology at the University of Texas El Paso, testified on the effects of Tandem and Orthene. Dr. Goldstein is a member of the society of toxicology and has published an extensive body of articles and given numerous presentations about toxicology. Dr. Goldstein was clear that he was not a medical doctor and could not diagnose patients, but he did testify regarding the possible effects of overexposure to Orthene and Tandem.

Dr. Goldstein testified that Orthene is a pesticide that contains the chemical acephate, which is from a group of phosphate insecticides. He said that the group of phosphate insecticides are "very extremely dangerous to become—to come into contact with" and is classified as a possible human carcinogen. Dr. Goldstein testified that Orthene has a strong odor and can get into a person's blood by breathing it, touching it, and ingesting it. Dr. Goldstein testified that if a person can smell Orthene they are breathing it in and getting it into their blood. Dr. Goldstein testified that Orthene in a person's blood targets the liver and nervous system that could cause confusion, tingling, and numbness. He said that once the chemical gets in a person's body, it remains until it is "metabolized out" through urination or some other excretion, but the damage done by the chemical "doesn't go away necessarily." The label for Orthene PCO Pellets begins with precautionary statements. It states that the product is harmful if swallowed and cautions that a person should avoid contact with eyes, skin, and clothing, and that a person should avoid breathing dust, sprays, or vapors. Contaminated clothing should be laundered before reuse. The label provides first aid instructions for Orthene exposure. The label authorizes use of Orthene in industrial, institutional, or commercial buildings, including offices.

Dr. Goldstein testified that Tandem is an insecticide made up of three chemicals, including lamdbacyhalothrin and propylene glycol, which all have varying levels of

toxicity. He testified that Tandem can also affect the central nervous system. The Tandem product label contains cautionary statements and first aid instructions similar to those on the Orthene label. It also states that Tandem should not be applied to "institutions (including libraries, sports facilities, etc.) when occupants are present in the immediate treatment area." Further, "[u]se in all indoor permitted sites . . . must be restricted to areas that eliminate exposure to food-handling surfaces and areas that are not easily accessible to occupants." Treated surfaces should dry before humans or pets contact the surfaces.

Dr. Goldstein had never heard of someone mixing Orthene and Tandem together. Dr. Goldstein explained that acute exposure is chemical exposure that occurs just one time, and chronic exposure is chemical exposure that occurs over the span of a few days or weeks. He testified that in cases of chronic exposure, a person can be exposed to "much less of the chemical and still have even a greater or worse response." Dr. Goldstein testified that the Plaintiffs experienced both acute and chronic exposure. But Dr. Goldstein did not know the amount of Tandem or Orthene sprayed in the Office Building or the rate of exposure experienced by the Plaintiffs. He believed that Plaintiffs' exposure to pesticides sprayed by GPC medically caused their symptoms. But he noted that he was not qualified to diagnose either and based his opinion on Dr. Henry's records.

*The Material Safety Data Sheet Warnings*

The Material Safety Data Sheet (MSDS) for Orthene PCO Pellets lists the potential health effects if ingested, inhaled, or contacted with skin or eyes as cholinesterase depression which is evidenced by headache, nausea, vomiting, diarrhea, abdominal cramps, excessive sweating, salivation and tearing, constricted pupils, blurred vision, tightness in chest, weakness, muscle twitching, and confusion. The MSDS also states:

- extreme cases of acute exposure can result in respiratory depression and death;

13

- chronic overexposure can result in the same or similar symptoms as acute overexposures; and

- certain underlying, preexisting conditions such as advanced liver disease, malnutrition, dermatomyositis, or existing toxicity from exposure to other carcinogens can increase someone's vulnerability to cholinesterase depression and associated symptoms.

The MSDS for Tandem identifies the risk of skin contact as temporary itching, tingling, burning, or numbness that can occur from splash, aerosol, vapor, or transfer contact with particular risk to the face. In addition, the propylene glycol ingredient can cause central nervous system depression such as dizziness and confusion as well as headache, nausea, and eye irritation. Prolonged contact can cause allergic reactions, and chronic dietary exposure can cause kidney and liver injury.

DISCUSSION

Plaintiffs present just two issues on appeal: First, that the district court erroneously granted Defendants' judgment as a matter of law on the issue of causation; and second, that the district court should have permitted their claim for punitive damages.

I.   NEGLIGENCE

This court reviews the district court's grant of a motion for judgment as a matter of law de novo "asking whether evidence existed from which a reasonable jury 'could properly find a verdict for the nonmoving party. [Citation omitted.]'" *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). The district court may only grant judgment as a matter of law in favor of a party after "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." K.S.A. 2020 Supp. 60-250(a)(1).

14

Before granting a party judgment as a matter of law, the district court must resolve all facts and inferences in favor of the party opposing the motion. See, e.g., *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008). If evidence is presented that permits reasonable jurors to reach different conclusions, the court must deny the motion. *Dawson v. BNSF Railway Co.*, 309 Kan. 446, 454, 437 P.3d 929 (2019). On appeal, this court will also review the evidence in the light more favorable to the party against whom the motion is sought, in this case the Plaintiffs. See *Deal*, 286 Kan. at 858.

Plaintiffs' negligence claim requires evidence that GPC owed them a duty, GPC breached the duty, the Plaintiffs suffered an injury, and GPC's breach proximately caused the Plaintiffs' injuries. See, e.g., *D.W. v. Bliss*, 279 Kan. 726, 734, 112 P.3d 232 (2005). Here, the district court determined the Plaintiffs failed to prove the final step—that GPC's breach caused their injuries. Typically, causation is a question of fact for the jury. See, e.g., *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278 (1987). However, when the facts of causation "are susceptible to only one inference, the question is one of law and may be disposed of summarily by the court." 240 Kan. at 557.

The only issue on appeal is whether Plaintiffs established causation. This court will not analyze and will accept as true that Plaintiffs have sufficiently shown that GPC owed them a duty, that GPC breached that duty, and that Plaintiffs have suffered an injury.

A. *Causation in a Negligence Claim*

On appeal, this court must determine whether a reasonable juror could find that Plaintiffs' exposure to pesticides sprayed by GPC proximately caused their injuries. "The proximate cause of an injury is the cause that in a natural and continuous sequence, unbroken by any superseding cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act.

[Citation omitted.]" *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 483 (2008). In Kansas, proximate cause has two components, causation in fact and legal causation. *Burnette v. Eubanks*, 308 Kan. 838, 846, 425 P.3d 343 (2018).

First, to establish causation in fact sufficient to submit a claim to a jury, "'a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that *more likely than not*, but for defendant's conduct, the plaintiff's injuries would not have occurred.'" (Emphasis added.) *Burnette*, 308 Kan. at 846. Second, to establish legal causation, the plaintiff must show "'it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable.'" 308 Kan. at 846. Under Kansas law, the proximate cause requirement is identical to the concept of legal causation as described in the Restatement of Torts. See 308 Kan. at 848 (citing Restatement [Second] of Torts § 431 [1965]).

A person's conduct is a *legal cause* of harm if "'(a) [the actor's] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which [the actor's] negligence has resulted in the harm.'" *Burnette*, 308 Kan. at 848 (quoting Restatement [Second] of Torts § 431 [1965]). Here, neither party argues that a rule of law exists relieving GPC of liability. Therefore, if GPC's actions in spraying pesticides in the Office Building is a "substantial factor" in Plaintiffs' harm, judgment as a matter of law for Defendants was inappropriate. Even when two or more causes could cause the harm, a defendant's negligence can still be found the legal cause of the harm. In cases where "'two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on [the actor's] part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.'" 308 Kan. at 848 (quoting Restatement [Second] of Torts § 432[2] [1965]).

16

In *Burnette*, the heirs and estate of the deceased, Vernon "Joel" Burnette, brought a medical malpractice action against medical providers alleging that their negligence caused Burnette's suicide. The plaintiffs claimed Burnette contracted bacterial meningitis from negligent lumbar epidural steroid injections in 2009 which caused Burnette to develop a severe pain disorder. The plaintiffs alleged that the pain disorder contributed to Burnette's death by suicide in 2013. The plaintiffs' experts testified that the medical negligence *contributed to* Burnette's suicide. One expert explained that Burnette's pain disorder "caused Joel to have bipolar symptoms that *contributed to* his worsening depression." (Emphasis added.) 308 Kan. at 853. The other expert, who saw the deceased just once, testified that chronic pain "'can contribute to depression and suicide'" and that depression "'is probably the most common symptom after pain.'" 308 Kan. at 853. The expert testified that "'Joel's physical pain contributed to his decision to end his life'" and the expert believed the pain "'contributed to cause'" his death by suicide. 308 Kan. at 853. After a trial, the jury returned a verdict for the plaintiffs and the defendants appealed, challenging whether the plaintiffs established causation between the defendant's earlier medical treatment in 2009 and Burnette's later suicide in 2013.

The experts in *Burnette* did not rule out every other cause, nor did they apportion the percentage of causes, yet the Kansas Supreme Court found that their testimony was sufficient to submit the causation issue to the jury. 308 Kan. at 856-57. Experts need not use magic language or establish the tortious conduct was the single cause of the harm—they merely need to provide an opinion based in fact about whether the identified negligence contributed to the alleged injury. Expert testimony is sufficient if it establishes the defendant's negligence *contributed to* the plaintiff's harm because "their actions had at least a part in causing [the harm]—either as the sole cause or as one cause that combined with others to produce the result." 308 Kan. at 856.

Similarly, the Kansas Supreme Court relied on its holding in *Burnette* when it found that a causation jury instruction in a medical malpractice case that included the

17

phrase "or contributed to" was not an error, even though the case did not involve comparative fault. *Castleberry v. DeBrot*, 308 Kan. 791, 803-04, 424 P.3d 495 (2018). In *Castleberry*, the patient suffered a stroke and alleged the primary care physician missed treatment opportunities to prevent the stroke. The court explained that "[t]he causation evidence was that treatment within the standard of care *probably would have*" prevented the harm, and that testimony was legally sufficient for a jury to establish causation. (Emphasis added.) 308 Kan. at 804. The expert did not guarantee the missed treatment opportunities would prevent the harm, nor give a percentage of likelihood.

### B. Kuxhausen *is Distinguishable from This Case*

Defendants heavily rely on *Kuxhausen v. Tillman Partners*, 40 Kan. App. 2d 930, 197 P.3d 859 (2008), to support their argument that Plaintiffs failed to sufficiently prove causation. But *Kuxhausen* is readily distinguishable. Stacy Lee Kuxhausen went to work on a Monday morning and testified she smelled paint and began to feel ill. She learned that an epoxy-based paint was applied in the basement of the building on the preceding Friday and Saturday. Kuxhausen entered the building twice over the next couple of days and estimated she spent a total of eight hours in the building after the epoxy-based paint application. Kuxhausen alleged that she suffered from ongoing multi-chemical sensitivity because of her eight-hour exposure to the epoxy-based paint smell.

At trial, Kuxhausen sought to present expert testimony from three doctors. Dr. Henry Kanarek, a medical doctor specializing in allergy, asthma, and immunology treatment, was the plaintiff's primary expert. Dr. Kanarek's expert qualifications were not in question. Dr. Kanarek physically examined Kuxhausen on a single occasion which included a discussion of her symptoms and totaled about an hour. Dr. Kanarek also reviewed tests and reports ordered by other physicians. The tests reviewed and Dr. Kanarek's physical examination found no physical abnormalities in Kuxhausen. Dr. Kanarek also reviewed the MSDS for the epoxy-based paint used in the basement of the

18

building, but he was unaware if the paint applied in the basement would cause any chemicals to be present in the air when Kuxhausen entered a different area of the building more than 24 hours after its application. Dr. Kanarek diagnosed Kuxhausen with multiple-chemical sensitivity because of exposure to epoxy-based paint based on the information he reviewed, his observation, and experience.

Kuxhausen also wanted to present testimony of Dr. Maurice Van Strickland, an allergist and immunologist, who saw Kuxhausen three times for an hour the first visit and about 15 minutes the subsequent two visits. Dr. Strickland ordered an x-ray of her sinuses, a pulmonary function test, and a mold sensitivity test. None of these tests demonstrated an abnormal result or sensitivity. Dr. Strickland diagnosed Kuxhausen with multiple-chemical sensitivity but did not identify the cause. He did not claim her condition resulted from exposure to epoxy-based paint. Kuxhausen also sought to introduce testimony from Dr. Daniel Doornbos, a pulmonologist, who also could not identify a cause of her condition. Dr. Kanarek was the only expert available for causation testimony. The district court excluded Dr. Kanarek's expert testimony regarding multiple-chemical sensitivity because it was not a generally accepted diagnosis, and also excluded testimony that Kuxhausen's ongoing medical problems were caused by her exposure to the epoxy-based paint fumes. Kuxhausen appealed.

The *Kuxhausen* panel found that Dr. Kanarek's testimony was properly excluded because the multiple-chemical sensitivity diagnosis was not a generally accepted diagnosis and explained that "Kansas law does not allow for expert opinions drawn from scientific principles that have not earned general acceptance." 40 Kan. App. 2d at 932. The panel also found that Dr. Kanarek's testimony was properly excluded because it was "based on unsupported assumptions or theoretical speculation." 40 Kan. App. 2d at 932.

The Kansas Supreme Court agreed, finding that Dr. Kanarek did state a causation opinion, but that the opinion lacked factual support. *Kuxhausen v. Tillman Partners*, 291

19

Kan. 314, 319-20, 241 P.3d 75 (2010). Dr. Kanarek admitted the multiple-chemical sensitivity diagnoses can be abused and that he was not sure how chemical exposure causes multiple-chemical sensitivity. Dr. Kanarek also testified that his examination of Kuxhausen and the medical tests revealed no abnormalities in her physical condition. Because the epoxy-based paint was applied to the basement more than a day before Kuxhausen entered the building, Dr. Kanarek could not state which chemicals in the paint remained in the air or at what level at the time of her entry. For these reasons, Dr. Kanarek's testimony lacked a factual foundation.

The expert testimony and factual bases in *Kuxhausen* differ from the expert testimony here. The Plaintiffs here provided far more factual support than Kuxhausen. First, Kuxhausen alleged she suffered from a medical condition that was not widely accepted in the medical community. The *Kuxhausen* panel stated that "most medical authorities say multiple-chemical sensitivity is not a recognized diagnosis." 40 Kan. App. 2d at 931. Dr. Kanarek even "acknowledged that the precise mechanism by which exposure to chemicals causes multiple-chemical sensitivity is unknown." 291 Kan. at 319.

Unlike Kuxhausen, the Plaintiffs here suffer from commonly accepted medical conditions that are known to result from chronic or acute exposure to the pesticides sprayed in the Office Building. Dr. Goldstein testified that exposure to Orthene can attack the central nervous system and liver and the MSDS for Tandem states the same. Dr. Henry testified that both Plaintiffs suffered from neuropathy, which is a condition resulting from attacks on the nervous system. Dr. Henry testified that the nervous system controls the brain and spinal cord, which in turn control the nerves, and that the component ingredients in Orthene can affect nerves. Dr. Henry diagnosed both Plaintiffs with neuropathy and testified to a reasonable medical certainty that their neuropathy relates to exposure to the chemicals sprayed by GPC in August 2015. Dr. Henry based her diagnoses on patient-provided medical histories, research into the causes of the

20

patient-reported ailments, and abnormal test results—including toxic core tests, which include blood and urine tests, and nerve fiber tests. Unlike Kuxhausen, the Plaintiffs here were diagnosed with a generally, medically accepted condition that is known to potentially result from exposure to certain toxins contained in the pesticides sprayed in the Office Building.

Second, Plaintiffs here provided evidence of exposure. The Plaintiffs were present during, shortly after, and for prolonged periods after the pesticide application, whereas Kuxhausen was not present for at least 24 hours after the epoxy-based paint application and was not in the same room, or even on the same floor, as the application. It was impossible for Kuxhausen's expert to say that Kuxhausen could have come into contact with the epoxy-based paint itself, any splatter, or the fumes. Contrarily, Najera was in the same room, right next to the chemicals being sprayed, and Shope arrived right after. Shope testified she could feel and taste the chemicals in the air. Najera worked in the application area for hours on the day of the application and both Plaintiffs worked in the area for several days after its application. Testimony revealed that visitors to the Office Building commented about the smell. The Office Building smelled so badly that it was abandoned entirely less than two months after the application. It is also common knowledge available to a jury that liquid pesticides sprayed in an area can result in airborne particles and splatter. The MSDS for Orthene Pellets states that applicators should wear waterproof gloves, socks, closed toe shoes, long-sleeved shirts, and pants when spraying the material. Plaintiffs also provided testimony regarding the exact chemicals sprayed and the possible health effects from chronic or acute exposure. Unlike *Kuxhausen*, the chemicals at issue and method of exposure—inhalation, touching, and tasting—were all known by Plaintiffs' expert.

*Kuxhausen* involved a claim where the plaintiff's alleged harm was not even an accepted diagnosis within the medical or legal community and there was no evidence

plaintiff was exposed to a toxin known to cause the controversial diagnosis. Defendants' reliance on *Kuxhausen* is misplaced.

i.      Plaintiffs Not Required to Remove All Doubt

Plaintiffs must provide competent evidence to demonstrate causation, but they are not required to prove causation beyond any doubt. Circumstantial evidence is sufficient to support causation when it "'affords a basis for a reasonable inference by the court or jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom. [Citation omitted.]'" *Kuxhausen*, 291 Kan. at 320. To put it simply, Plaintiffs need not exclude each and every possible causation of their injuries so long as competent evidence supports their causation argument. Plaintiffs here have medical conditions and symptoms consistent with those identified as risks of acute or chronic exposure to the chemicals applied to the Office Building in August 2015.

In addition to the evidence regarding Plaintiffs' medical conditions, Dr. Goldstein's testimony regarding potential effects of exposure, the MSDS for the chemicals applied, and Dr. Henry's diagnosis, there is also evidence that after almost a year and extensive remediation, remnants of the pesticides at issue remained in the Office Building. Moreover, the Plaintiffs' symptoms developed close in time to their exposure, which can be circumstantial evidence for establishing causation. See *Burnette*, 308 Kan. at 850 (citing Restatement [Second] of Torts § 433 [1965] explaining that temporal proximity can provide evidence supporting causation). Dr. Henry testified that she could not state Shope's chemical exposure was the "primary" factor in causing her neuropathy. But such testimony is not required. The causation evidence "'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.'" *Kuxhausen*, 291 Kan. at 320. The medical expert is also not required to use magic or special wording, such as *reasonable medical certainty* when testifying regarding causation. See *Nunez v. Wilson*, 211 Kan. 443, 445-46, 507 P.2d 329 (1973).

22

The district court also noted some of the distinctions between *Kuxhausen* and this case and stated its reliance on *Munoz v. Clark*, 41 Kan. App. 2d 56, 199 P.3d 1283 (2009), which is incorrectly referred to in the transcript as *Nunez v. Clark*. In *Munoz*, the plaintiff had laproscopic surgery to remove her ovaries, but the postsurgery pathology report revealed that the tissue removed did not include ovary tissue. The surgeon believed he removed the plaintiff's ovaries and did not reconcile the pathology report with his belief. The plaintiff claimed the surgeon's negligent failure to reconcile the pathology report caused her ovaries to remain, which caused her prolonged and increased pelvic pain. The plaintiff provided testimony from her treating physician that the plaintiff's "pelvic pain came from her endometriomas and adhesions." 41 Kan. App. 2d at 60. The physician expert defined endometriomas as "ovaries containing endometrial tissues." 41 Kan. App. 2d at 60. After a jury verdict in favor of the plaintiff, the defendant appealed alleging plaintiff provided no "expert evidence proving his deviation from the standards of professional conduct as the cause of [the plaintiff's] subsequent medical complaints." 41 Kan. App. 2d at 60.

On appeal, the panel agreed that the plaintiff needed expert testimony regarding causation on whether the physician's failure to reconcile the pathology report and remove plaintiff's ovaries caused her medical condition. The trial testimony revealed that although Munoz suffered from several gynecological conditions before and after her surgery that were unrelated to the failed surgery, she suffered from chronic pelvic pain postsurgery that was not present presurgery. The treating physician diagnosed this pain resulting from "ovaries containing endometrial tissues," which a panel of this court found could allow a jury to conclude that the surgeon's failure to remove the plaintiff's ovaries caused her medical condition. The expert did not testify that the surgeon's failure to reconcile the pathology report caused the plaintiff's injury—but the testimony provided evidence "from which a jury could find a verdict in favor of [the plaintiff]." 41 Kan. App. 2d at 65.

23

It is unclear which part of *Munoz* the district court relied upon for its grant of Defendants' motion, but *Munoz* is yet another example of Kansas courts permitting a jury to determine causation when evidence presented could support a verdict about which reasonable minds could disagree.

        ii.        Plaintiffs' Evidence is More Than *Post Hoc, Ergo Propter Hoc*.

The expert testimony here is not *post hoc, ergo propter hoc* reasoning. Dr. Henry's and Dr. Goldstein's testimony was not merely based on pure speculation, nor the mere premise that because one event occurred before another, the first must have caused the second. The pesticides used are known, the exposure is known, the potential effects of exposure are known, the Plaintiffs' medical conditions and diagnoses are known, and the physical exams and lab work could support the medical diagnoses. This is different than *Kuxhausen*, where the plaintiff was not present when the epoxy-based paint was applied, did not touch, taste, or feel the paint, was never in the same room as the painted surface, and no one could testify which, if any, chemicals from the paint might remain in the air more than 24 hours after application. In other words, Kuxhausen's alleged exposure to the epoxy-based paint fumes or chemicals was purely speculative. Here, there is no speculation that Plaintiffs were in the same location during, right after, and for prolonged periods after liquid chemicals were sprayed onto surfaces and into the air of the Office Building. Their exposure is not speculative; and to require them to list the weight or volume of exposure would preclude the submission of causation to the jury in almost every exposure case.

Defendants' counsel argues that the Plaintiffs must prove the exact amount of exposure. If plaintiffs claiming negligence were required to prove the exact amount of poison, salmonella, radiation, or other toxin to which they were exposed, defendants could avoid all liability simply through failure to keep accurate records. In the case of a plaintiff working with toxins known to cause illness upon inhalation, under Defendants'

24

argument that plaintiff would need to prove the exact amount inhaled just to submit a case to the jury. What about a toddler who drinks from a bottle of poison? Under Defendants' argument, the plaintiff would have to prove the exact amount consumed before submitting the case to the jury. Let us assume the toddler did not take a measurement and the plaintiff forgot the amount in the bottle. In all such cases, a defendant could avoid a trial and total liability by alleging the amount of toxin ingested, inhaled, touched, or otherwise introduced was not known and thus causation could not be submitted to the jury. Such a result defies logic. Defendants are free to provide evidence, which might be compelling, contradicting Plaintiffs' exposure allegations. But at some point in the fact-finding, it must be left up to the jury to determine the sufficiency of the evidence. See *Deal*, 286 Kan. at 859 ("In the vast majority of cases, the question of negligence is a factual determination for the jury, not a legal question for the court.").

*Kuxhausen* stands for the proposition that, among other things, Plaintiffs must allege they suffered an accepted diagnosis and identify the alleged toxins and method of exposure—not that they must state the exact quantity of the toxins the Plaintiffs' inhaled, touched, or ingested or the exact amount Defendant sprayed. Moreover, Plaintiffs' exposure was shown through circumstantial evidence of the witness testimony about what they saw, smelled, and tasted, how they felt, the extensive mitigation efforts conducted to remediate the smell and physical effects, the closure of the Office Building, and the chemical tests performed almost a year later. Defendants argue for a nearly impossible standard, inconsistent with Kansas law on causation, that would permit Defendants to avoid liability through inept recordkeeping.

Submission of this case to the jury does not mean Plaintiffs have proven their claims but that they have provided enough evidence to present a question of fact for the jury. Defendants seek affirmation of the district court's decision, citing to numerous flaws in Plaintiffs' claims—including abundant evidence that Plaintiffs' injuries, if any, resulted from other causes. Defendants' arguments might very well persuade a reasonable jury,

25

but that does not entitle them to judgment as a matter of law. Causation is appropriately submitted to the jury where credible evidence, which includes circumstantial evidence, exists about which reasonable minds could disagree.

Accordingly, this court reverses the district court's judgment as a matter of law in favor of Defendants and remands this case to the district court for further proceedings.

II.     MOTION TO ADD CLAIM FOR PUNITIVE DAMAGES

Plaintiffs also allege that the district court erred in denying their pretrial motions to amend their petitions to add a claim for punitive damages. Prior to trial, the district court denied both motions to amend finding neither had shown a probability they could sustain their burden to show GPC acted wantonly. However, the district court left the door open to revisit this issue. In its pretrial order, the district court stated that Plaintiffs can "renew their motion for punitive damages depending on evidence discovered or presented during or before trial." Because this case is remanded for a new trial, this court cannot know what, if any, evidence presented may support a claim for punitive damages and cannot reach the issue in this appeal.

CONCLUSION

When there is competent evidence upon which reasonable minds could differ, it is the jury's responsibility to determine causation. The district court's order granting Defendants' judgment as a matter of law is reversed. Additionally, Plaintiffs' claim regarding their motions to amend to include punitive damages is not ripe for consideration at this time.

Reversed and remanded for a new trial.